# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| ORLY GENGER, in her individual capacity and<br>On behalf of the Orly Genger 1993 Trust (both in its<br>Individual capacity and on behalf of D&K Limited Partnership,<br>Plaintiff | Index no. 109749/09<br>IAS Part 12 (Feinman, JSC)<br>E-FILED CASE |
| v. | AFFIRMATION IN SUPPORT<br>OF MOTION TO DISMISS |
| DALIA GENGER et al,<br>Defendants | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ROBERT A. MEISTER, a member of the New York Bar, hereby affirms under the penalties of perjury:

1        I make this affirmation in support of the motion of DALIA GENGER as Trustee of the Orly Genger 1993 Trust (the "Orly Trust") to dismiss the Petition on the grounds that (1) it fails to state a cause of action against Dalia Genger, (2) is barred in part by the statute of limitations, and (3) is barred by collateral estoppel or, in the alternative, staying this action until the final determination of the proceeding Plaintiff commended on July 1, 2009, in Surrogate's Court, New York County, against Dalia Genger, as Trustee of the Orly Genger 1993 Trust, file no. 0017/2008.

### THE CLAIMS AGAINST DALIA GENGER

2        The complaint purports to state three claims against Dalia Genger: alleged breach of fiduciary duty arising from her being Trustee of the Orly Genger 1993 Trust ("Orly Trust") and from her being plaintiff's mother (First Cause of Action);  fraud (Fifth Cause of Action); and for conspiracy to commit fraud (Eighth Cause of Action).   None of them states a valid cause of action, as shown separately below.

## THE FIDUCIARY DUTY CLAIM

3      The alleged breaches of fiduciary duty were  Dalia Genger's (a) failure to inform Orly Genger of TPR's foreclosure on shares of TPR Investment Associates, Inc. ("TPR") that were admittedly pledged to secure the $8,950,000 Promissory Note that states it was to be repaid by December 21, 2003, that D&K LP made and delivered to TPR in 1993 (the "D&K Note"), (b) failure to "take any action to protect or defend the Orly Trust's interest in TPR in face of" TPR's enforcement of the D&K Note, and (c) failure to defend the Orly Trust's asserted interest in the pledged TPR shares.  These events occurred in 2008, after March 8, 2008, when, at plaintiff's request, Surrogate Roth had directed Dalia Genger, as Trustee of the Orly Trust, during the pendency of plaintiff's proceeding to remove her as trustee, that "no actions were to be taken with reference to the Trust assets."  See August 28, 2008 letters from Orly Genger's then counsel, Lawrence M. Rosenstock, Esq., to Dalia Genger and her former counsel, Exhibit A hereto.  Surely Dalia Genger cannot be liable for having followed a direction of the Surrogate's Court procured by plaintiff herself.

4      Moreover, plaintiff is collaterally estopped from asserting that the Orly Trust or plaintiff Orly Genger herself owned the pledged TPR shares.  In the final Decision and Order in *Orly Genger v. Fang*, et al., Surrg. Ct., N. Y. Co., file 17/2008, December 31, 2008 (Exhibit B hereto)(hereinafter "December 31, 2008 Decision"), Surrogate Roth held that the Orly "[T]rust is not a shareholder of TPR at all.  Rather, D&k LP, an entity in which the [Orly] trust own a 48% [Limited Partner] interest, in turn owns approximatelt 50 percent of TPR" and pledged the TPR shares.  (December 31, 2008 Decision at 6).  Thus plaintiff Orly Genger lacks standing to sue.

5       Nor could Dalia Genger be found liable for the Orly Trust's assuming liability under the D&K LP Note, as that was done in 1993 by a prior trustee of the Orly Trust. (See D&K Note, Complaint Ex. 1, pages 2-3, where the Orly Trust by its prior Trustee "assumes and becomes liable for" 48% of the D&K Note "and agrees that the Holder may enforce its Note, to the extent of such liability, as if the [Orly Trust] were the maker thereof." Also, any claim for damages for breach of fiduciary duty arising from the 1993 making of the D&K Note or its guarantee would have occurred before Dalia Genger became trustee of the Orly Trust in 2008 (December 31, 2008 Decision) and would in any event be barred by the applicable three year statute of limitations. *Papp v. Debbane*, 16 A.D.3d 128 (1st Dep't 2005)

6       Neither can Dalia Genger be sued based on an asserted breach of a fiduciary duty arising from her being the mother of plaintiff. As the court noted in *United States v. Reed*, 601 F. Supp. 685, 706 (S.D.N.Y. 1985):

'mere kinship does not of itself establish a confidential relation.' [Bogert, *Confidential Relations and Unenforcible Express Trusts,* 13 Cornell L.Q. 237 (1928)] § 482, at 300-11 (footnote omitted). *See, e.g., Francois v. Francois,* 599 F.2d 1286, 1292 (3d Cir.1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 679, 62 L.Ed.2d 653 (1980) (spouses); Comment, *The Confidential Relationship Theory, supra,* 29 Fordham L. Rev. at 564, 566. [footnote collecting cases omitted]

7       Nor could Dalia Genger, Orly Genger, or D&K LP have acted to prevent TPR from declaring a default and foreclosing on the promissory D&K Note. Undisputed are the following facts:

A.      The Orly Trust is not a shareholder of TPR. (December 31, 2008 Decision at 6);

B.      The Orly Trust is a 48% Limited Partner in D&K LP. (December 31, 2008 Decision at 6);

C.   In 1993, D&K LP made and delivered to TPR the $8,950,000 D&K Note that states it was to be repaid by December 21, 2003, in partial consideration for D&K LP's purchase of common stock of TPR, which stock was pledged to secure the D&K Note.  (Complaint ¶18 and D&K Note, Ex. 1);

D.   A prior trustee of the Orly Trust signed a written guarantee of the D&K Note in which the Orly Trust "assumes and becomes liable for" 48% of the D&K Note "and agrees that the Holder may enforce this Note, to the extent of such liability, as if the [Orly Trust] were the Maker thereof." (See D&K Note, Ex. 1 to Complaint); and

E.   The D&K Note has not been fully repaid and D&K LP stopped making regular payments on the D&K Note in 1999 and made only sporadic payments thereafter. (Complaint ¶44).  Indeed, in her 2007 Verified Petition in *In the Matter of Orly Genger v. Leah Fang et al.*, Surrg. Ct., N. Y. Co. file no 0017/2008, a copy of which is Exhibit C hereto,  which Orly Genger verified December 27, 2007, Orly Genger admitted (¶7(a)(iii)) that the Orly Genger "Trust is indebted in the amount of approximately $4.5 million" under the D&K Note, and further admitted (¶39) that Orly Genger was concerned that "the remaining assets of the Trust are in danger of being foreclosed upon as a result of the default on the Note."

7        Thus Plaintiff Orly Genger herself admitted in her 2007 Petition that the pledged

shares were "in danger of being foreclosed upon as a result of the default on the Note."  Moreover,

the Complaint in this action gives no legally sufficient reason why the D&K Note and guarantee

would not be enforceable.  The complaint does not allege that <u>TPR</u> ever renounced its rights under

the D&K Note and guarantee by destroying the D&K Note or by delivering the D&K Note or by

signing a writing cancelling or renouncing the D&K Note, as required by NY UCC §3-605(1) for

the D&K Note to become unenforceable.  It is hornbook law that the enforceability of a Note is not

affected by a mere statement by the maker or guarantor that the Note is unenforceable.  As the court

held in *Ber v. Johnson*, 163 A.D.2d 817, 818 (4th Dep't 1990):

> Because defendants' original obligation constituted a note and guarantee, it was required to
> be in writing *(see*, <u>Uniform Commercial Code § 3-104 [1], [2]</u>; <u>General Obligations Law §
> 5-701 [a] [2]</u>) and the Statute of Frauds precludes an oral executory modification. '[W]here
> an original agreement comes within [the] provisions of the statute of frauds requiring
> certain agreements to be in writing, the statute of frauds renders invalid and ineffectual a
> subsequent oral agreement changing the terms of the written contract, no matter how slight
> the attempted variation or by whom it was made' ( <u>61 NY Jur 2d, Frauds, Statute of, §140,
> at 217-218</u>; *see*, <u>*M. H. Metal Prods. Corp. v April*</u>, 251 NY 146, 150; <u>*Van Iderstine Co. v
> Barnet Leather Co.*, 242 NY 425, 430</u>; <u>*Heroux v Page*, 107 AD2d 862, 863</u>; <u>*Awad & Co. v
> Pillsbury Mills*, 9 AD2d 870</u>, *lv denied* <u>8 NY2d 705</u>, *appeal dismissed* <u>8 NY2d 747</u>; *cf.*,
> <u>General Obligations Law §§ 5-1103</u>, <u>15-301</u> [1], [2]). Thus, defendants may not rely on
> plaintiff's alleged oral acceptance of the stock as the basis for their defense of modification.

See also *Josephthal Holdings, Inc. v. Weisman*, 5 A.D.3d 221-222 (1st Dep't 2004), in which the

First Department held that "[a]lthough [the debtors] contend that their payment obligation under

these notes were orally modified, the pledge agreement, to which the notes were subject, prohibited

oral modification of the notes (*see* <u>General Obligations Law § 15-301 [1]</u>)" . . ..

8 For these legal reasons, the 2006 statement by Mr. Sagi Genger on behalf on D&K LP that D&K LP and its partners "deny the enforceability of the Note" (Complaint Ex. 8) would not constitute a defense to TPR's declaration of default and foreclosure, as a matter of law.  Nor would enforceability of the D&K Note have been affected if Dalia Genger *had* stated "that no one was ever supposed to foreclose on the Note," as the complaint claims in ¶48.  But she did not so state; in the document cited basis for that claim – Complaint Ex. 9 ¶3  –  Dalia Genger merely stated that the purpose of a Board Resolution was "to carry out our [Dalia and Arie Genger's] understanding that I [Dalia Genger] would not be in the position to foreclose on the D&K Note, and to take for myself an interest that Arie and I intended for the children."  (Emphasis added.)  As the D&K Note and guarantee were enforceable in accordance with their terms, Dalia Genger's alleged failures to take some unspecified action or notify plaintiff could not be a basis on which to impose liability on her.

9       Plaintiff should not be permitted to burden this Court with a third bite at the apple. Her first bite, *Orly Genger v. Fang*, et al., Surrg. Ct., N. Y. Co., file 17/2008, resulted in the December 31, 2008 Final Decision and Order rejecting her claim that Dalia Genger engaged in wrongdoing.  For her second bite, on July 1, 2009, plaintiff Orly Genger commenced yet another proceeding in Surrogate's Court, New York County, captioned *In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the Orly Genger 1993 Trust pursuant to SCPA §711(11)*, File No. 17/2008 ("The Second Proceeding"), which alleges that Dalia Genger breached her fiduciary duty as Trustee by the very same omissions that are alleged in this action and seeks to remove and surcharge her therefore.  (A copy of that Petition, without the voluminous exhibits -- which are mostly exhiubits to the instant complaint -- is Exhibit D hereto.)  (I inform the Court that my cross-motion to dismiss the Second Proceeding on the grounds that the Petition fails to state a valid claim is now fully submitted and is *sub judice* before the Surrogate's Court.)  Then a month and a half after commencing her Second Proceeding in Surrogate's Court, plaintiff commenced this action – her third bite - seeking the relief against Dalia Genger on the same allegations of breach of fiduciary duty.  For reasons of sound judicial economy, the fiduciary duty claims in this action should be dismissed so they can be litigated in The Second Proceeding, which was filed before this one.  Alternatively, they should be stayed pending resolution of The Second Proceeding.

## THE FRAUD AND CONSPIRACY TO COMMIT FRAUD CLAIMS

10      As the First Department held in *Browning Ave. Realty Corp. v. Rubin*, 207 A.D.2d 263, 266 (1st Dep't 1994), under New York law

> To establish its common law cause of action for fraud, the plaintiff had to demonstrate that the defendants knowingly uttered a falsehood intending to deprive the plaintiff of a benefit and that the plaintiff was thereby deceived and damaged (*Channel Master Corp. v. Aluminium Ltd. Sales*, 4 N.Y.2d 403, 406-407, 176 N.Y.S.2d 259, 151 N.E.2d 833). The essential elements are the representation of a material existing fact, falsity, scienter, deception and injury (*id.*, at 407, 176 N.Y.S.2d 259, 151 N.E.2d 833).

As Justice Fried recently noted in *Apex Equity Partners Inc., v. Murray*, 18 Misc. 3d 1137A, 859

N.Y.S.2d 892 (table), 2008 WL 498468 (Sup. Ct. N. Y. Co. 2008):

> To sustain a cause of action alleging fraud, a party must show a misrepresentation or a
> material omission of fact which was false and known to be false by the defendant, made for
> the purpose of inducing the other party to rely upon it, justifiable reliance of the other party
> on the misrepresentation or material omission, and injury" ( citations omitted).

And CPLR Rule 3016(b) requires that in pleading fraud, the factual basis for these elements "shall

be stated in detail."

11      The Complaint fails to adequately to plead the elements of fraud, much less with the

required particularity.

A. **Absence of Knowingly False Statement.** Paragraphs 114 and 117 pleads only

generally and vaguely that "Dalia made statements, including sworn statements,

affirming that all interested parties to the Note (Arie, Sagi, Orly, TPR and D&K)

had agreed that TPR would never seek to enforce the Note . . .." As noted above,

the allegations in paragraph 48 and Exhibit 9 do not support that statement, and

there are no other detailed factual allegations of statements that do.

B. **Absence of Factual Basis for Scienter.** Paragraph 115 pleads only generally

and vaguely that Dalia's statements "were intended to be accepted as true and

relied on by interested parties to the Note, including Orly." No factual basis for

this allegation is pleaded, and as Orly was not a party to the D&K Note and had

no capacity to prevent its enforcement, there would be no basis for such if

pleaded.

C. **Absence of Reliance.** Paragraph 116 pleads only generally and vaguely that Plaintiff Orly relied on Dalia's alleged statement that she "would not allow anyone to enforce the Note against D&K." There is no detailed statement of how Orly relied and what she did or didn't do. Indeed, as she was not a party to the D&K Note, neither she nor D&K could have taken any action, as discussed in paragraphs 7-8 *supra*.

D. **Absence of Damages to Plaintiff.** Damages also are pleaded only generally and vaguely. See Paragraph 120. As Orly was not a party to the D&K Note, she suffered no damages.

Thus the complaint does not adequately plead fraud, and plaintiff does not have a fraud claim against Dalia.

12      As for the conspiracy to commit fraud claim, it is clear that "New York does not recognize civil conspiracy to commit a tort as an independent cause of action" and that "[s]uch a claim stands or falls with the underlying tort." See *Alexander & Alexander of N. Y. v. Fritzen,* 68 N.Y.2d 968, 969 (1986); *Ward v. City of New York*, 15 AD3d 392, 393, (2d Dept 2005); *Sokol v. Addision*, 293 A.D.2d 600, 601 (2d Dep't 2002 ); *Apex Equity Partners Inc., v. Murray*, 18 Misc. 3d 1137A, 859 N.Y.S.2d 892 (table), 2008 WL 498468 (Sup. Ct., N. Y. Co. 2008).

WHEREFORE the action against Dalia Genger should be dismissed.

Robert A. Meister

**EXHIBIT "A"**

## MARKEWICH AND ROSENSTOCK LLP

8 East 41st Street • Fifth Floor • New York, New York 10017
tel: (212) 542-3156   fax: (212) 481 1761   lrosenstock@mrlawllp.com

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

August 28, 2008

**BY HAND AND MAIL**

Dalia Genger
200 East 65th Street, 32W
New York, New York 10021

Re:    1993 Orly Genger Trust

Dear Ms. Genger:

It has come to our attention that you may be considering attempting to act on behalf of the Orly Genger Trust (the "Trust").

We remind you that you have no authority to act for the Trust and that on March 4, 2008 Surrogate Roth directed that no actions were to be taken with reference to the Trust assets. Should you violate the Court order, or in any way interfere with the ownership and/or value of the Trust assets or take any action with respect to Trust assets, we will hold you personally responsible for any loss or damage that may be incurred and seek to hold you in contempt. To the extent others are involved in guiding or facilitating wrongful conduct on your part, we will also seek remedies against them.

We reserve any and all rights with respect to your conduct concerning the Trust.

Very truly yours,

Lawrence M. Rosenstock

LMR:js

cc:    Jonathan G. Kortmansky, Esq. (by hand)
Sulllivan & Worcester LLP

Orly Genger

Genger-letter dalia genger 8-28.doc

**MARKEWICH** AND **ROSENSTOCK LLP**

8 East 41st Street • Fifth Floor • New York, New York 10017

*tel:* (212) 542-3156  *fax:* (212) 481 1761   *lrosenstock@mrlawllp.com*

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

August 28, 2008

**<u>BY HAND AND EMAIL</u>**

Jonathan G. Kortmansky, Esq.
Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, New York 10104

Re:   <u>1993 Orly Genger Trust</u>

Dear Mr. Kortmansky:

    I am writing you on behalf of Orly Genger, the beneficiary of the Orly Genger Trust(the "Trust"). By letter dated August 28, 2008, a copy of which is enclosed, we advised Dalia Genger, among other things, that when we were before the court on this matter on March 4, 2008, Surrogate Roth directed that no actions were to be taken with respect to Trust assets. As attorneys for Dalia Genger we expect that you will so advise your client of this direction and to take all appropriate steps to see that she complies with Surrogate Roth's order.

Very truly yours,

Lawrence M. Rosenstock

LMR:js

cc:   Hon. Surrogate Renee R. Roth
      Orly Genger

*Genger-letter dalia genger 8-28.doc*

**EXHIBIT "B"**

SURROGATE'S COURT : NEW YORK COUNTY                    JAN 0 2 2009

---------------------------------------- X
In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER          File No. 0017/2008
for the Benefit of ORLY GENGER.
---------------------------------------- X

R O T H ,  S .

        This is a contested application by the primary beneficiary

(Orly Genger) of an irrevocable inter vivos trust established by

her father, Arie Genger, seeking the appointment of a successor

trustee or, alternatively, the appointment of a "special trustee"

to investigate alleged wrongdoing concerning the trust.

Petitioner's mother, Dalia Genger (grantor's former wife),

contends that she is the duly appointed successor trustee and

that there is no basis to appoint another fiduciary for any

purpose.

        The trust agreement, dated December 13, 1993, provides for

discretionary income and principal distributions to Orly for life

with remainder to her descendants or, if none, to the grantor's

descendants in trust.

        Article SEVENTH (B), (D), (E), and (G) of the trust

instrument sets forth the following procedure for the resignation

of trustees and the appointment of their successors.

        A trustee may resign by delivering a signed and acknowledged

instrument of resignation in person or by certified or registered

mail to the other trustee and to either the grantor or the income

beneficiary.  Such resignation is effective upon the receipt of

the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

trustee, purported to discharge Mr. Parnes from liability.  It is
undisputed that thereafter Ms. Fang acted as trustee.  Indeed,
Ms. Fang's contention that she received a number of requests for
information from petitioner and that petitioner referred to her
in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in
accordance with the trust agreement, attempted to appoint
Patricia Enriquez, as successor trustee.  Her designation of Ms.
Enriquez, however, was by an unacknowledged letter in which she
referred to her own resignation as taking effect upon Ms.
Enriquez's acceptance of the appointment.  Ms. Enriquez accepted
by signing the letter, but such acceptance was not acknowledged
and, in any event, there is nothing in the record to suggest that
such "acceptance" was delivered in accordance with the trust
instrument.  Two weeks later, an attorney for Ms. Enriquez
notified petitioner's counsel by email that her client had
advised that she had no intention to overcome the procedural
omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before
a notary a memorandum in which Ms. Fang stated that "to the
extent that I am still vested with any powers to appoint trustees
of the [trust], I confirm your appointment."  The next day, Ms.
Fang executed an acknowledged instrument of resignation and
appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance.  It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed.  In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor).  However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day.  Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position.  Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit.  Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement.  Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened.  Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust.  To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act.  The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee.  Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc. She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust. Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee".  Similarly, petitioner's
allegations (made upon information and belief) that Dalia had
knowledge of alleged improper acts by former trustee, David
Parnes, in relation to TPR are patently insufficient to warrant
the remedy of a "special trustee".  In such connection, it is
noted that Mr. Parnes and Ms. Fang have been directed to account
for their proceedings as trustees (<u>Matter of Genger</u>, NYLJ, Feb.
25, 2008, at 29, col 3), giving petitioner a forum to seek relief
for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that
Dalia has refused a request for information, which would warrant
relief (SCPA 2102), or has failed as trustee to protect trust
assets.  Indeed, it appears that Dalia (who states that she is
ready and able to act as fiduciary) has yet to assume the duties
of trustee in deference to her daughter's position in this
litigation.  As a validly appointed trustee, she should be given
the opportunity to do what she deems necessary to manage and
protect the trust's assets.

Based upon the foregoing, the appointment of a "special
trustee" is unwarranted at this time and, accordingly, the
application is denied, without prejudice to renewal if future

7

circumstances warrant such relief.

This decision constitutes the order of the court.

_____

S U R R O G A T E

Dated: December 31, 2008

8

**EXHIBIT "C"**

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of

    ORLY GENGER,

                Petitioner,

          -against-

LEAH FANG, DAVID A. PARNES and SAGI
GENGER,

                Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - X

Index No.

**PETITION TO
COMPEL
ACCOUNTING AND
FOR OTHER RELIEF**

TO THE SURROGATE'S COURT, COUNTY OF NEW YORK:

    It is respectfully alleged that:

## Parties and Interested Persons

    1.    Petitioner, Orly Genger ("Orly"), is the beneficiary of The Orly Genger 1993 Trust ("Trust"), a true and complete copy of which is annexed hereto as Exhibit 1.   Orly is a resident of the County of New York.

    2.    Respondent David A. Parnes ("Parnes") is a former trustee of the Trust, and a resident of the State of Israel.  Parnes is also a member of the Bar of the State of New York.

    3.    Respondent Leah Fang ("Fang") purported to act as trustee of the Trust from on or about April 26, 2007 until on or about December 13, 2007, although she was not properly authorized to do so.  Respondent Fang

is a resident of the County of New York.  Fang is also a member of the Bar of the State of New York.

4.     Respondent Sagi Genger ("Sagi") is Orly's brother, and is married to Fang's sister.  Upon information and belief, Sagi conspired with, and aided and abetted, Respondents Parnes and Fang in breaches of fiduciary duty and other tortious behavior to the detriment of Orly.  Sagi is a resident of the County of New York.

5.     The Settlor of the Trust is Arie Genger ("Arie" or Grantor), Orly's father.  Arie is a resident of the State of Florida.

6.     There are no persons other than those here named in paragraphs 1 through 5 of this Petition who are interested in this proceeding.

**<u>Relief Requested</u>**

7.     By this Petition, Orly seeks an order:

    a.     Directing that:

        i.     Parnes be required to file a full and complete account of the 1993 Orly Genger Trust (the "Trust"), for the period October 22, 2004 through the present;

        ii.     Fang be required to file a full and complete account of the Trust for the period April 26, 2007 through the present;

Genger-Petiton to Compel #4(3).doc

iii.   Parnes and Fang be required to turn over all documents relating to or concerning the Trust and/or its assets, in their custody, possession or control, including but not limited to documents concerning the assignment to Parnes of a note (the "Note") as to which the Trust is indebted in the amount of approximately $4.5 million;

iv.   Sagi, as the person in control of the Trust's most substantial asset D & K LP ("D&K"), provide an accounting of D & K LP, II and of its largest asset TPR Investment Associates, Inc. ("TPR"), of which Sagi is also in control;

b.   Enjoining the respondents from any further interference with the Trust, and from selling, disposing of, encumbering, or pledging any of the Trust estate or effects in their hands, or making any transfer, or from selling, disposing, encumbering, or pledging any of the goods, effects, or assets of the said Trust, or from paying out any of the moneys or assets thereof, or disposing of, concealing, altering, mutilating, or otherwise interfering

with the books, records, vouchers, papers, and documents having reference to said Trust;

c.   Appointing Lawrence Small ("Small") as Successor Trustee;

d.   Declaring that neither Parnes nor Fang nor Eric Gribetz has any authority as trustee, and that none currently holds the position of trustee or has any interest in the Trust;

e.   Directing that Sagi, Parnes and Fang appear and give testimony relating to the assignment of the Note to Parnes;

f.   Awarding damages to Orly as a result of the wrongdoing of Parnes, Sagi and Fang;

g.   Denying any indemnification to Parnes which he might claim entitlement pursuant to any agreement; and

h.   For such other and further relief as to this Court seems just and proper.

## Creation of the Trust

8.   The Trust was created by Arie to benefit Orly during her life.

9.   Simultaneously, a virtually identical trust was created by Arie to benefit Sagi during his life ("Sagi's Trust").

10.   The original corpus of each trust was $600,000.

Genger-Petiton to Compel #4(3).doc

11.     Pursuant to the Trust, Lawrence M. Small and Sash A. Spencer were appointed trustees, and they duly qualified as the original trustees ("Original Trustees").  (Ex. 1, Article SEVENTH (A))

12.     The Trust further provided that, upon a duly acknowledged document sent by certified or registered mail to the other trustees and to either the Grantor or the beneficiary of the Trust, the Trustees could resign and designate successors.  (Id. (B))

13.     In order to qualify as successor trustees, the persons designated were required to deliver acknowledged acceptances, by certified or registered mail, to either the Grantor or the beneficiary.  Id.

14.     On or about October 22, 2004, the Original Trustees, Lawrence M. Small and Sash A. Spencer resigned as trustees, and in their place designated, respectively, Parnes and Eric Gribetz.  (Ex. 2)  On or about October 29, 2004, Gribetz and Parnes duly accepted the respective designations. These documents were delivered to the Grantor by registered mail.

15.     Thereafter, on or about February 12, 2007, Gribetz sent notice to Petitioner that he was resigning as Trustee.  (Ex. 3)  This notice was not acknowledged, as required by the Trust instrument but Gribetz has not acted as Trustee since that date.

-5-

16.    On or about April 26, 2007, Parnes sent notice to the Grantor that he was resigning as Trustee and appointing Leah Fang as successor. (Ex. 4)    This notice was not acknowledged, as required by the Trust instrument and Fang never validly acknowledged acceptance of appointment as trustee, as required by the Trust Instrument.

17.    Nonetheless, beginning on or about April 26, 2007, Parnes ceased acting as Trustee, and Fang did act as Trustee although, as set forth below, her conduct fell below that of a reasonable fiduciary.

18.    Thereafter, on or about December 12, 2007, Fang sent notice to the beneficiary that she was resigning as Trustee, and appointing Patricia Enriquez in her place.  Upon information and belief, Patricia Enriquez is the life partner of Leah Fang's sister.  Neither the purported resignation, nor Enriquez' purported acceptance was properly acknowledged or delivered by registered or certified mail.

19.    Enriquez, through counsel, has declared that she is not acting as trustee, never has acted as trustee, and has no intention of qualifying to act as trustee.  (Ex. 5)

**The Note and the TRI Stock**

20.    Upon information and belief, the current assets of the Trust consist solely of stock in Trans-Resources, Inc. ("TRI"), a closely held

Genger-Petiton to Compel #4(3).doc

corporation controlled by Arie, and a 48% interest in D & K, a Delaware limited partnership currently controlled by Sagi.

21.    In turn, D & K owns 49% of TPR Investment Associates, Inc. ("TPR"). This interest was purchased by D & K principally by provision of a note, payable by D & K to TPR, but as to which there is recourse for 48% of the debt to the Trust ("Note").

22.    The Trust's interest in D & K, and its liability on the Note, was created virtually at the same time the Trust was created by Arie. D & K's original partners were Sagi and Orly's mother, Dalia, who had a 4% interest and who was the general partner, and Orly and Sagi, each of whom owned 48% of the partnership.

23.    Pursuant to a series of agreements entered into at or about the time the Trust and Sagi's Trust were created, Orly and Sagi assigned their interests in D & K to their respective trusts, and D & K purchased 49% of the outstanding stock of TPR.   The purchase price of the TPR stock was $1,250,000 in cash and plus the Note, which had a face value of $8,950,000. The cash payment was funded $600,000 by each of the trusts, and $50,000 by Dalia.  Obligation for the Note was assumed equally by each of the trusts, and secured by a pledge in the purchased stock.

24.    No payments have been made on the Note since January 2006.

Genger-Petiton to Compel #4(3).doc

**The Scheme: Concocted By Sagi and Parnes<u>and Executed by Sagi, Parnes and Fang.</u>**

25.   In or about 2002, Arie and Dalia encountered marital difficulties and litigation was commenced.

26.   In or about October 2004, Arie and Sagi agreed to a stipulation setting distribution of their marital property.  Shortly prior to the execution of the settlement agreement, Sagi, allegedly on behalf of Dalia, insisted that there would be no settlement unless the trustees of the Trust and Sagi's Trust resign and designate successor trustees named by Sagi.

27.   Arie capitulated to Sagi's manipulations and did convince Small and Spencer  to resign as Trustees, and to designate as successors Sagi's close friends Eric Gribetz (whom Sagi had known from childhood), and Parnes (an Israeli friend whom Sagi met when Sagi served in the Israeli army after high school.)

28.   In conjunction with the change in trustees and the marital settlement, the following effects occurred:

      a.   Parnes and Gribetz became successor trustees, but insisted on an agreement purportedly indemnifying them from any liability as a result of their conduct as trustees;

      b.   Sagi took over control of D & K, then the Trust's only asset;

-8-

c.   Sagi took over control of TPR, the stock of which was then D & K's only asset, and the entity which held the Note; and

d.   TPR sold its 3000 shares of TRI stock, for a dollar a share to Arie (794.4 shares) and sold each of the Trusts(1102.8 shares) shares of TRI for a dollar a share (thereby giving each of the trusts approximately 20% of the shares in TRI).

29.   Upon taking control of D & K and TPR, Sagi – upon information and belief in collusion first with Parnes and then with Fang – began diverting assets from TPR for his own use, without providing fair and adequate consideration, and without distributing to the Trust or to Orly her pro rata share.

30.   Upon information and belief, Sagi, with the agreement and cooperation of Parnes and Fang, distributed to himself and to others almost $900,000 a year from TPR, while Orly received only $140,000 per year.  In addition,

31.   Petitioner was kept in the dark regarding the assets of her Trust, and when she requested information from the Trustees, none was forthcoming.  When Orly made a request for information from Gribetz, he immediately resigned.  A subsequent request to Parnes occasioned his

-9-

resignation and the designation of Fang, Sagi's sister-in-law.  No information has been received from Fang, although requested.

32.    In or about August 2006, Sagi created yet another part of this scheme, and as the person in control of TPR and thus the Note, Sagi purported to "assign" the Note -- valued at almost $9 million -- to Parnes in exchange for release of an alleged obligation to Parnes in the amount of $12,000.  The terms of the purported "assignment", upon information and belief, were incomplete, subject to amendment and placed significant restrictions on the purported assignee.  The document also provided that if Parnes collected on the Note, a percentage of the collections would go back to entities controlled by Sagi.  (Ex. 6).

33.    By the attempted assignment, Sagi sought to strip TPR of its value and assets and by so doing destroy the value of the collateral provided by D & K to secure the Note.

34.    At the time Parnes was involved with the purported assignment of the Note – ie at the time Parnes became a possible obligee of Orly's Trust – Parnes was still Trustee.

35.    Upon information and belief, Sagi, as controlling person of TPR, colluded with Parnes regarding the purported assignment of the Note to Parnes, and Sagi and Parnes so acted with the intent to harm Petitioner.

Genger-Petiton to Compel #4(3).doc

36.    Upon information and belief, when Sagi and Parnes finally became concerned about the conflict of interest between Parnes' position as Trustee and creditor, Sagi arranged for Parnes to resign, and to "designate" as his successor, Fang –– Sagi's sister-in-law.

37.    Upon information and belief, Fang, Parnes and Sagi all colluded to prevent Orly from receiving any information regarding the assets which were the corpus of the Trust.

38.    Upon information and belief, Sagi, in conjunction with Parnes and Fang, arranged for payments to be made from TPR to Sagi, Parnes and others, to the exclusion of Orly and/or Orly's Trust.

## Petitioner's Requests for Information

39.    Since at least January 2007, Petitioner has been regularly requesting information regarding the assets and liabilities of the Trust, as well as information regarding the Note.  All requests made by Petitioner to Parnes, Fang and Sagi have been to no avail, and Petitioner is without any real information as to the assets and liabilities of the Trust, whether or not such assets may have been dissipated, and whether the remaining assets of the Trust are in danger of being foreclosed upon as a result of the default on the Note.

40.    When Orly retained counsel to assist her in requests for information from Fang, first Fang dissembled and created excuses for not

providing information and then Fang attempted to absolve herself of responsibility by purportedly handing off the trusteeship to Enriquez.

41.    As set forth above, it has now become clear that Fang's entire assumption of the trusteeship was improper, as was her attempt to designate Enriquez as successor.

42.    No accounting has ever been provided by Parnes, Fang or any person regarding the assets and liabilities of the Trust.

43.    The names and addresses of all the persons interested upon whom service of process is required or concerning whom the court is required to have information, so far as they can be ascertained with due diligence, are as follows:

David Parnes, 29 Elkachi Street, Tel-Aviv 69497 Israel

Leah Fang, 630 First Avenue, Apartment 25G, New York, New York 10016 and

Sagi Genger, 1211 Park Avenue, New York, New York 10128.

44.    There are no other persons than those mentioned interested in this proceeding.

45.    No previous application for the relief prayed for herein has been made to this Court or to any other court or judge.

WHEREFORE, the petitioners pray that an order be issued:

a.    Directing that:

-12-

i.     Parnes be required to file a full and complete account of the 1993 Orly Genger Trust (the "Trust"), for the period October 22, 2004 through the present;

ii.     Fang be required to file a full and complete account of the Trust for the period April 26, 2007 through the present;

iii.     Parnes and Fang be required to turn over all documents relating to or concerning the Trust and/or its assets, in their custody, possession or control, including but not limited to documents concerning the assignment to Parnes of a note (the "Note") as to which the Trust is indebted in the amount of approximately $4.5 million;

iv.     Sagi, as the person in control of the Trust's most substantial asset D & K, provide an accounting of D & K, and of its largest asset TPR, of which Sagi is also in control;

b.     Enjoining the respondents from any further interference with the Trust, and from selling, disposing of, encumbering, or pledging any of the Trust estate or effects in their hands, or making any transfer, or from selling,

-13-

disposing, encumbering, or pledging any of the goods, effects, or assets of the said Trust, or from paying out any of the moneys or assets thereof, or disposing of, concealing, altering, mutilating, or otherwise interfering with the books, records, vouchers, papers, and documents having reference to said Trust;

c.   Appointing Lawrence Small as Successor Trustee;

d.   Declaring that neither Parnes nor Fang nor Eric Gribetz has any authority as trustee, and that none currently holds the position of trustee or has any interest in the Trust;

e.   Directing that Sagi, Parnes and Fang appear and give testimony relating to the assignment of the Note to Parnes;

f.   Awarding damages to Orly as a result of the wrongdoing of Parnes, Sagi and Fang;

g.   Denying any indemnification to Parnes which he might claim entitlement pursuant to any agreement; and

Genger-Petiton to Compel #4(3).doc

h.    For such other and further relief as to this Court seems

just and proper.

Dated:   December 27, 2007
         New York, New York

MARKEWICH AND ROSENSTOCK LLP
*Attorneys for Petitioner*

By:

EVE RACHEL MARKEWICH
8 East 41st Street, Fifth Floor
New York, New York 10017
(212) 542-3156

-15-

Genger-Petiton to Compel #4(3).doc

# VERIFICATION

STATE OF _Florida_          )
                           : ss.:
COUNTY OF _Dade_            )

ORLY GENGER, being duly sworn, deposes and says:

I am the Petitioner in the within proceeding.  I am acquainted with the facts and circumstances set forth herein, have read the foregoing Petition, and know the contents thereof; that the same is true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and that as to those matters I believe them to be true.

_____
ORLY GENGER

Sworn to before me this 27th day
of December, 2007

_____
NOTARY PUBLIC

VALERIA GALLO
Notary Public - State of Florida
My Commission Expires Apr 21, 2009
Commission # DD 421456
Bonded By National Notary Assn.

Potter – verification.doc

**EXHIBIT "D"**

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**VERIFIED PETITION FOR
REMOVAL OF DALIA GENGER
AS TRUSTEE AND REQUEST
FOR TEMPORARY
RESTRAINING ORDER**

**FILE NO.:  0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys Cozen O'Connor,

respectfully alleges as her Verified Petition for Removal of Dalia Genger as Trustee:

1.      Orly, domiciled at 1965 Broadway, Apt. 22G, New York, New York 10024, is the

current beneficiary of the Orly Genger 1993 Trust dated December 13, 1993 (the "Orly Trust")

(annexed hereto as Exhibit A).  Dalia Genger, residing at 200 East 65th Street, Apt. 32W, New

York, New York 10021 ("Respondent" or "Dalia"), Orly's mother, is the current sole Trustee of

the Orly Trust, and was appointed successor Trustee in January 2008.

2.      Based upon the allegations contained herein, Petitioner requests that this Court

provide the following relief:

(a)      Enjoining and restraining Respondent, her agents, and all other persons

acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc. ("TRI"),[1] a closely held corporation, founded

---

[1] TRI is the parent company of several subsidiaries that provide growers with specialty fertilizer and
industrial chemicals, including Haifa Chemicals Ltd., Na-Churs Alpine Solutions, Plant Products Co. Ltd., and Elgo
Irrigation Co.

by Arie Genger ("Arie"), Petitioner's father and Respondent's former husband, and any other assets which may be remaining in the Orly Trust. The Orly Trust's TRI shares are in imminent danger of being sold by Respondent and her son, Orly's brother, Sagi Genger ("Sagi"), for the purpose of benefiting Sagi Genger and presumably Respondent, and depleting and denuding the value of Orly's Trust;

(b)     removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and imprudently managing and injuring the property committed to her charge. As will be demonstrated herein, Respondent has conspired with, and participated in the diversion of trust assets to, Sagi, who underhandedly sold without any objection from Respondent, the Orly Trust's indirect interest in TPR Investment Associates Inc. ("TPR"), a closely held family-owned corporation.

(c)     surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding the Petitioner costs and attorneys' fees;

(d)     appointing Michael D. Grohman, Esq., as successor trustee;

(e)     waiving any requirement that Petitioner post an undertaking; and

(f)     granting Petitioner such further relief deemed necessary or proper.

3.     To assist the Court in perceiving the severity of Respondent's conduct and the urgency of the provision of extraordinary relief, the following is an overview of the facts supporting this Petition.

## I.     OVERVIEW

4.     Arie and Dalia were married on July 23, 1967, in a ceremony held in Israel. In 2004, however, their marriage ended in divorce. Prior to 1993, at which time Dalia and Arie were married, Dalia and Arie formed D & K LP ("D & K"), a family-owned limited partnership

whose name was shorthand for "Dalia and Kids." At the time of its formation, Dalia, the general partner, held a 4% interest, and Orly and Sagi, the limited partners, each held a 48% interest.

5.     In December 1993, Dalia and Arie also established identical irrevocable *inter vivos* trusts for the benefit of each of their children: the Orly Trust and the Sagi Genger 1993 Trust (the "Sagi Trust"). For estate-planning purposes, Dalia and Arie funded each trust with a $600,000 gift. The intent behind the trusts was to ensure that both children received property of equal value. Sash A. Spencer and Lawrence M. Small were named Co-Trustees of both trusts and remained Co-Trustees until the Genger's divorce. After the Trusts were funded, Orly and Sagi each assigned their 48% interests in D & K to their Trusts.

6.     At the same time in December 1993, D & K purchased 240 shares of common stock (constituting 49% of the outstanding shares) in TPR for $10,200,000. The shares were purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia, totaling $1,250,000, and the balance was satisfied with a recourse $8,950,000 promissory note (the "Note") (a copy of which is annexed hereto as Exhibit B). Pursuant to the Note, principal, together with accrued interest, was to be repaid by D & K in annual installments over ten years. The Note was secured by a pledge of the 240 TPR shares owned by D & K. Each of the Trusts and Dalia assumed liability on the Note in proportion to its/her direct interest in D & K. Accordingly, each of the Orly and Sagi Trusts assumed a 48% liability on the Note and acquired a 23.52% indirect interest in TPR and Dalia assumed a 4% liability on the Note and a 1.96% indirect interest in TPR. Payments were made on the Note until 1999, at which time D & K stopped making payments with the implied consent of the interested parties.

7.     At the time of the above-described transaction, Arie owned the remaining 51% of TPR, which held investments in various securities, including TRI common stock, as well as its

interest in the Note.  As of March 30, 2001, TPR held a 52.85% interest in TRI.  The remaining

minority interest in TRI (47.15%) was owned by various entities controlled directly and

indirectly by Jules and Eddie Trump (the "Trump Group").

8.     On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of

Settlement as a final settlement of their divorce (the "Settlement Agreement") (annexed hereto as

Exhibit C).  Pursuant to the Settlement Agreement, Dalia received, *inter alia*, Arie's 51% interest

in TPR and retained her 4% interest in D & K.  TPR's 52.85% interest in TRI was transferred to

Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust, and (iii) 19.43%

to the Sagi Trust.  The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime

voting proxy over their TRI shares (annexed hereto as Exhibit D).  Therefore, after October 29,

2004, Arie and the two Trusts held a controlling interest in TRI, and TPR no longer owned any

TRI common stock.

9.     In connection with the divorce settlement, Dalia took measures to cede

management of D & K and TPR to her son Sagi.  On October 21, 2004, days before signing the

Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"), whose sole

purpose was to act as the general partner of D & K.  Dalia exchanged her 4% interest in D & K

and $1.00 for a 99% membership interest in D & K GP.  Sagi purchased a 1% membership

interest in D & K GP for $1.00.  Pursuant to the Limited Liability Agreement of D & K GP

(annexed hereto as Exhibit E), Sagi was given the power to select a manager of D & K GP whose

function would be to control D & K's assets.  Sagi selected himself to act as manager; thus, Dalia

effectively handed Sagi the authority to control D & K and its assets.  Also, by forming D & K

GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K,

including any personal liability related to the Note.  This left the Trusts solely liable on the Note.

10.     On October 30, 2004, Dalia entered into a shareholder agreement with TPR that provided for the management of TPR.  Specifically, pursuant to the shareholder agreement (annexed hereto as Exhibit F), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board.  Sagi, as the managing partner of D & K, appointed himself as a board member of TPR.  As the majority owner of TPR, Dalia was named as the other board member.  In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR.  Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

11.     Below, for the Court's convenience, is a side-by-side summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's interests in TPR before and after Arie's and Dalia's divorce.[2]

### TPR OWNERSHIP
### BEFORE AND AFTER DIVORCE

#### PERCENTAGE

| Person | TPR Before | TPR After |
|---|---|---|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96% |
| Orly Trust | 23.52% | 23.52% |
| Sagi Trust | 23.52% | 23.52% |
| **TOTAL** | **100%** | **100%** |

---

[2] For the Court's convenience, the chart annexed hereto as Exhibit G provides a summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's ownership interests in TPR, TRI, and D & K as of October 26, 2004 — i.e., the date that Arie and Dalia executed the Settlement Agreement.

12.     In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust. In January 2008, Dalia was appointed successor trustee of the Orly Trust, despite Orly's objection. By that time, as a result of Dalia's granting him control of TPR and D & K, and through the appointment of his friends and relatives as successor trustees of the Trusts, Sagi effectively had obtained control over the assets held by all of D & K, TPR, the Sagi Trust, and the Orly Trust.

13.     On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K, and TPR, assigned the Note – which then had an approximate value of $11,000,000 as a result of accrued interest – to Mr. Parnes for only $12,000. (A copy of the Memorandum dated August 2, 2006, assigning the Note is annexed hereto as Exhibit H.) The assignment stated that D & K "denied enforceability of the Note" (see Exhibit H annexed hereto), which presumably is why it was "sold" for $12,000. Sagi signed the assignment on behalf of both TPR, as the maker, and D & K, as the holder. Dalia was copied on the memorandum assigning the note, but neither Orly, the Orly Trust, nor the then-Trustee of the Orly Trust received copies of the memorandum. At the time of this assignment, Mr. Parnes was acting as trustee of both the Orly Trust and the Sagi Trust. Shortly after the assignment, Mr. Parnes resigned as Trustee of the Orly Trust in recognition of the inherent conflict he faced in that role.

14.     Sometime in 2007, Sagi sold a 2% interest in TPR to Rochelle Fang.  The cost of

the 2% interest was based upon a bogus valuation of TPR at $50,000,000.  At the time of the

sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the

value of the Note.  This sale effectively stripped Dalia of her majority interest in TPR giving

Sagi unfettered control of TPR, in addition to his control of D & K and D & K GP.  In January

2008, when Dalia was appointed successor trustee of the Orly Trust, she completely divested

herself of the balance of her TPR shares.  Dalia has not informed either the Court or Orly as to

when she transferred her TPR interest.

15.     On August 22, 2008, unbeknownst to Orly, Rochelle Fang, who had been

appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust's 19.43% interest in TRI to

the Trump Group, who already owned 47.15% of TRI's outstanding shares, for $26,715,416.

This sale purportedly transferred control of TRI from Arie to the Trump Group who thereafter

purported to hold 66.58% of TRI's outstanding common stock.[3]  In connection with the supposed

sale, Sagi and David Parnes were given seats on TRI's board of directors.  If given effect, this

purported sale, which was consummated after Dalia was appointed successor trustee of the Orly

Trust, would dilute and diminish the value of the Orly Trust's interest in TRI.

16.     Dalia, who had notice of the supposed sale, made no effort to prevent the sale or

to protect the value of the Orly Trust's interest in TRI.  Fearing that Dalia would continue to

neglect her duty to protect the Orly Trust's assets, on January 10, 2009, Petitioner wrote a letter

(annexed hereto as Exhibit I) to her mother stating that "for now, and until further notice, it is my

---

[3] The validity of the sale is at issue in litigation currently pending in Delaware Chancery Court.  The
parties to the action are Arie Genger, TRI, and various entities affiliated with the Trump Group.  The Orly Trust has
not appeared in the action.  In that action, the Trump Group claims to have bought the shares either from the Sagi
Trust or from TPR – thus, the approximately $27 million purportedly paid by the Trump Group either belongs to the
Sagi Trust or to TPR, depending on the outcome of the litigation in Delaware.

strong desire to retain all of the shares of TRI that are currently in the Orly Trust, and I direct

you not to sell them."  Dalia refused to agree not to dispose of the TRI shares.

## II.   THE EVIDENCE DISCOVERED BY PETITIONER ON JUNE 1, 2009, REQUIRES INJUNCTIVE RELIEF AND THE IMMEDIATE REMOVAL OF DALIA AS TRUSTEE

17.   In February 2008, Orly applied to this Court to designate a Trustee, or in the

alternative to appoint a special trustee, claiming that Dalia and all of the preceding successor

trustees of the Orly Trust were improperly appointed and had no authority to act on behalf of the

Orly Trust.  Orly also alleged wrongful dealings by Dalia as Trustee of the Orly Trust.  In

denying the application without prejudice, this Court stated that Orly had made allegations

without sufficient supporting evidence and suggested that Orly commence an SCPA § 2201

proceeding to obtain the necessary evidence and then renew her application.  (A copy of the

Court's decision is annexed hereto as Exhibit J.)

18.   On May 14, 2009, as a prerequisite to the SCPA § 2201 application, Orly's

counsel sent Dalia Genger a letter (annexed hereto as Exhibit K) requesting documents related to

the Orly Trust's assets.  Soon thereafter, Orly's counsel was notified that Dalia had retained

Robert A. Meister, Esq., of Pedowitz & Meister, LLP, and Orly's counsel therefore forwarded a

copy of the May 14th letter to Mr. Meister.

19.   On June 1, 2009, Mr. Meister responded to Orly's document demand by advising

Orly's counsel that the Orly Trust no longer owned any interest in TPR.  According to the letter,

Sagi, acting as CEO of TPR, had foreclosed on the Note and had sold D & K's 240 shares of

TPR for $2,220,000.  (A copy of the Letter dated June 1, 2009, is annexed hereto as Exhibit L.)

Before that time, Dalia had neither advised nor notified Orly that Sagi had foreclosed on the

Note,[4] nor advised Orly that Sagi had sold the TPR shares at auction. Thus, upon receipt of Mr. Meister's letter, Orly learned for the first time that:

(a)     On August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the general manager of D & K, that D & K was in default of the Note and declared that unless the entire unpaid principal amount of the Note was paid immediately, TPR would sell, at auction, the 240 shares pledged as collateral. (A copy of the Notification dated August 31, 2008, is annexed hereto as Exhibit M.)

(b)     Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K (of which he remained the managing partner) that D & K's 240 shares of TPR stock would be publicly auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt. (A copy of the Notification is annexed hereto as Exhibit N.) Sagi purported to notify the interested parties of the sale by publishing notice of the sale in the New York Post in October 2008 and February 2009. Although at all relevant times Sagi had Orly's contact information, he never informed her of the impending sale.

(c)     On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the 240 shares of TPR and "auctioned" the shares. Not coincidentally, the Sagi-controlled TPR purchased the shares at auction for $2,200,000. (See Exhibit O). The proceeds of the sale – i.e., $2,220,000 – were used to decrease D & K's obligations under the Note, leaving a balance of approximately $8,800,000.

20.     On June 11, 2009, Orly's counsel sent Mr. Meister a letter asking that Dalia, in accordance with Orly's January 2009 request and in light of the secretive diminution of the Orly

---

[4] While the Note had not been serviced since 1999, TPR had not foreclosed on the Note between 1999 and 2008 because it previously had agreed not to foreclose on the Note in order not to upset the estate-planning goals underlying the Note.

Trust's interest in TPR, stipulate in writing that she would not, under any circumstances and until all issues were resolved, sell, transfer, or remove the TRI shares from the Orly Trust. (A copy of the Letter dated June 11, 2009, is annexed hereto as <u>Exhibit P</u>.) That same day, Mr. Meister responded to the June 11th letter, but he failed to address the terms of the proposed stipulation. (A copy of Mr. Meister's Letter dated June 11, 2009, is annexed hereto as <u>Exhibit Q</u>.)

**A.    A Temporary Restraining Order ("TRO") Is Necessary To Protect The Remaining Assets Held By the Orly Trust**

21.    It is clear from Dalia's deliberate inaction and complete deferral to Sagi in all matters related to D & K, TPR, and TRI, that without Court intervention Orly's TRI shares will be: a) sold at a significantly discounted rate so that the proceeds can be used to pay her unpaid portion of the Note, b) used as collateral to secure the Orly Trust's unpaid portion of the Note, or c) used to satisfy a Judgment against the Orly Trust. Since Orly's address was known to her brother and her mother at all relevant times, publishing notice of the sale of the TPR shares alone was a clear and deliberate attempt to prohibit Orly from intervening in the foreclosure and the sale. Dalia, who had knowledge of the events as they were transpiring, easily could have given notice of the auction to Orly, but she intentionally chose not to. There is now reason to believe that Dalia will again remain passive if and when Sagi seeks to hijack, sell, or otherwise meddle with the Orly Trust's TRI shares, even though Orly has specifically advised her mother, in writing, to protect the Trust's ownership of the TRI shares.

22.    There is no reason to trust that Dalia will honor her daughter's wishes and instructions since, from the time of her divorce, she has done nothing but ensure that Sagi has complete control over TPR, D & K, and D & K GP, and has allowed Sagi to do as he pleases. At this time, approximately $8,800,000 of the Note remains unsatisfied, and Sagi, as CEO of TPR, has not voided the notice of default. Based upon Dalia's deliberate inaction and failure to protect

the Orly Trust's assets to date, there is strong evidence to reasonably conclude that Dalia will not

protect the Orly Trust's interest in the TRI shares, but rather, will act to benefit herself and Sagi,

including by allowing Sagi to obtain the TRI shares to satisfy the Orly Trust's unpaid portion of

the Note.  Without immediate injunctive relief, Orly will have no recourse and the Orly Trust

will be vulnerable to complete depletion.  The harm caused to the Orly Trust under these

circumstances would be irreparable.

23.     Based on the facts and documentary evidence presented herein it is likely that the

Orly Trust will succeed on the merits of her Petition.  Accordingly, she meets the criteria

necessary to obtain a TRO and a preliminary injunction.  Petitioner therefore respectfully

requests that the Court grant her Petition for a TRO and a preliminary injunction in order to

protect the assets held by the Orly Trust, including the TRI shares.

**B.     Dalia Must Be Removed As Trustee Immediately**

24.     Based on the information provided to Orly's counsel on June 1, 2009, which

confirms Respondent's lack of diligence and disloyal service as Trustee, there now exists

sufficient evidence to have Respondent removed as Trustee of the Orly Trust.  While serving as

Trustee, Dalia intentionally failed to notify Orly that TPR was taking measures to foreclose on

the Orly Trust's 23.52% indirect interest in TPR.  It was Dalia's duty as a fiduciary of the Orly

Trust to be apprised of all activity concerning the Orly Trust and to ensure that Orly received

proper notification of the default and auction.  Moreover, Dalia actually knew of the foreclosure

and the auction, but took no steps to protect the Orly Trust's interest in TPR.  Dalia knew of

Sagi's plan to foreclose on the Note and sell the TPR shares as early as August 2008; thus, she

withheld information concerning the auction from Orly for almost ten months.  Dalia did not

disclose the foreclosure and share sale until she received the demand letter from Orly's counsel

and realized that legal action was imminent.  Instead of protecting the Orly Trust's and its

beneficiary's interests, Dalia sat back and silently watched her son strip the Orly Trust of its indirect interest in TPR.

25.     The corporate structure which has intertwined TPR, D & K GP, and D & K's assets, all of which are in some manner controlled by Sagi as a result of Dalia's actions, permits Dalia and Sagi to engage in self-dealing and does not provide for any accountability on either Sagi's or Dalia's part.  Unfortunately, the Orly Trust is caught in the middle of Dalia's and Sagi's conspiracy to engage in self-dealing intended to benefit their own interests, while Sagi has been permitted to diminish and dissipate the value of the Orly Trust's assets, including its interests in TPR and, potentially, TRI.  By enriching herself and her son at the expense of her daughter, Dalia is in breach of her fiduciary duties as Trustee of the Orly Trust.  It is imperative that Orly have a successor trustee appointed who will unbiasedly and loyally protect the Orly Trust's remaining assets.

(1)     **In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Did Nothing To Stop Sagi From Attempting to Sell His Trust's TRI Shares, Which, If Valid, Would Dilute the Value of the Orly Trust's Assets**

26.     The Sagi Trust's attempted sale of its interest in TRI to the Trump Group for $26,715,416, which occurred after Dalia was appointed successor trustee of the Orly Trust, purportedly transferred control of TRI from Arie to the Trump Group.  As mentioned above, supra paragraph 15, if this purported sale were given effect, then the value of the Orly Trust's assets would be significantly diminished.  If the purported sale were valid and effective, then Arie would no longer own a controlling interest in TRI, and thus the Orly Trust would no longer own a portion of the controlling block of TRI shares.

27.     Dalia, as a fiduciary of the Orly Trust, was obligated to apprise herself of any transactions that could affect the value of the Orly Trust's shares, and, in fact, Dalia was contemporaneously aware of the Sagi Trust sale.  But Dalia made no effort to protect the value of

the Orly Trust's TRI shares by challenging the proposed sale.  Moreover, she has taken no

position with regard to the current value of the TRI shares and has taken no measures to protect

the Orly Trust's interest in TRI since the purported sale, despite Orly's urgings.  By remaining

passive with respect to the Orly Trust's TRI shares, Dalia is completely ignoring the intent

behind the establishment of the Orly Trust – to transfer an equal amount of assets to each of the

children.  Dalia, through her actions and her inaction alike, may have permitted Sagi to secure

substantially more value from the Trusts' assets than Orly.

    **(2)**    **In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust,
Dalia Took No Action To Protect the Orly Trust's Interest in TPR**

    28.    Pursuant to the August 2006 memorandum assigning the Note to David Parnes –

on which Dalia was copied – Sagi, acting as the managing partner of D & K, took the position

that the Note was unenforceable.  (See Paragraph 4 of Exhibit H annexed hereto.)  In the exact

same memorandum, however, Sagi, acting as the CEO of TPR, took the directly contrary

position that TPR reserved its right to enforce the Note.  (See Paragraph 8 of Exhibit H annexed

hereto.)

    29.    On February 14, 2007, Dalia, who participated in the "sham" transaction between

Sagi and Mr. Parnes, and in a clear attempt to clean her hands of any impropriety, admitted in a

sworn statement to the Court that no one was ever supposed to foreclose on the Note.  (See

Paragraph 3 of Exhibit R annexed hereto).  Additionally, the unpaid Note was the subject of a

post-judgment arbitration proceeding between Dalia and Arie, which took place in September

2007.  Dalia, who was present at the proceedings, heard Sagi and Mr. Parnes testify that the Note

should not be enforced and that Sagi, as CEO of TPR, had no intention of collecting the unpaid

portion of the Note.  Thus, Dalia knew long before August 2008 that TPR had effectively

disclaimed its right to foreclose on the Note.

30.     As described above, however, in August 2008 (eleven months later), Sagi sought

to enforce the Note.  Contrary to the position he had taken under oath at the arbitration, and

contrary to the position he had taken as the managing partner of D & K (see Paragraph 4 of

Exhibit H attached hereto), Sagi issued a default notice to D & K on behalf of TPR.  Dalia, who

knew the Note was never intended to be enforced and who previously had sworn to as much,

should have immediately sought to block Sagi from foreclosing on the Note and selling the TPR

shares.  Notwithstanding her knowledge and her previous statements, however, Dalia failed to

make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the

Orly Trust had a clear interest in the TPR shares at issue.  As a fiduciary of the Orly Trust with

prior, as well as continued knowledge, of the TPR foreclosure, TPR's supposed claims against D

& K, and D & K's ability to challenge those claims based on prior representations, Dalia had a

duty to protect the Orly Trust's indirect ownership of the TPR shares.  But instead of taking the

proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR

shares for himself to the detriment of the Orly Trust.[5]

31.     Additionally, Dalia's failure to act in the face of the foreclosure and sale of TPR

stock is especially egregious because she has known since August 2008 that the purported sale of

TRI stock to the Trump Group is being challenged in Delaware state court.  She also has known

that in that action the Trump Group is asserting that it bought the TRI stock from *either* the Sagi

Trust *or* TPR.  Thus, she has known that, depending on the outcome of the litigation in

Delaware, the Orly Trust could have an interest in the $27 million paid by the Trumps in August

---

[5] Moreover, in connection with her appointment as successor trustee of the Orly Trust in January 2008, Dalia divested herself of her TPR shares (without informing either the Court or Orly as to when she transferred her interest) in a further attempt to distance herself from any attributable wrongdoing.  Dalia has contended to this Court that she sold her TPR shares in order to avoid any appearance of impropriety in connection with her appointment as Trustee.  Interestingly, however, Dalia has never informed Orly or this Court whether she continues to maintain a 99% interest in D & K GP, the company that controls D & K and, thus, was obligated to service the Note.

2008 if its interest in TPR were preserved. Accordingly, as trustee of the Orly Trust, she should have been especially vigilant in protecting the Orly Trust's interest in TPR through D & K. But instead, she allowed Sagi to essentially steal the Orly Trust's interest in TPR so that Sagi can attempt to retain the entire $27 million regardless of the outcome in Delaware Chancery Court. Her inaction in this regard is a blatant violation of her fiduciary duties as trustee.

III.   **DALIA SHOULD BE SUR-CHARGED IN THE AMOUNT OF THE LOSS OF THE VALUE OF ORLY'S INTEREST IN TPR AS DETERMINED BY THE COURT AND ORLY SHOULD BE AWARDED ATTORNEYS' FEES**

32.   By failing to take action on behalf of the Orly Trust to prevent Sagi from foreclosing on the Note and selling D & K's TPR shares, Dalia caused the Orly Trust to lose its interest in TPR. Accordingly, Dalia should be surcharged in an amount of the loss of the value of Orly's interest in TPR as determined by the Court and should be required to reimburse the Orly Trust for its attorneys' fees incurred in connection with bringing this action.

IV.   **MICHAEL D. GROHMAN, ESQ. SHOULD BE APPOINTED AS SUCCESSOR TRUSTEE**

33.   Based on Dalia's deliberate breach of her fiduciary duties to the Orly Trust, and in light of Dalia's prior nefarious conduct as the Orly Trust's Trustee, this Court should remove Dalia as Trustee and replace her with Michael D, Grohman, Esq. Mr. Grohman is a member of the New York Bar and the head of the Trust and Estates practice group at Duane Morris LLP. Mr Grohman is not acquainted with any members of the Genger family, does not have any interest in TRI, TPR, or D & K, and is willing and prepared to succeed Dalia immediately.

34.   No prior application has been made for the relief requested herein.

**PRAYER FOR RELIEF**

WHEREFORE, based upon the allegations contained herein, Petitioner requests that this Court provide the following relief:

(a)     Enjoining and restraining Respondent, her agents, and all other persons acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly Trust's 19.43% interest in TRI and other assets remaining in the Orly Trust;

(b)     removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and improvidently managing and injuring the property committed to her charge;

(c)     surcharging Respondent in the amount of the loss cf the value cf Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)     appointing Michael D. Grohman, Esq., as successor trustee;

(e)     waiving any requirement that Petitioner post an undertaking; and

(f)     granting Petitioner any other relief it deems necessary and proper.


Dated:   New York, New York
         June 22, 2009

ORLY GENGER
Petitioner


COZEN O'CONNOR

By: _____
    Judith E. Siegel-Baum, Esq.
    Attorney for Petitioner
    250 Park Avenue
    New York, New York 10017
    212-986-1116

# VERIFICATION

STATE OF NEW YORK )                )
                                   )ss.:
COUNTY OF NEW YORK )                )


The undersigned, the Petitioner named in the foregoing petition, being duly sworn, says: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and believe, and as to those matters I believe it to be true.


_____
Signature of Petitioner


ORLY GENGER
_____
Print Name


Sworn to before me this
22nd day of June, 2009.

_____
Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

ANN MEADE
Notary Public, State of New York
No. 01ME4783921
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires Sept. 30, 2009