# EXHIBIT F

FILED: NEW YORK COUNTY CLERK 09/20/2011
NYSCEF DOC. NO. Case 1:19-cv-05641-VSB   Document 45-6   Filed 03/30/20   Page 2 of 69 SCEF: 09/20/2011

INDEX NO. 651089/2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARIE GENGER and ORLY GENGER, in her
individual capacity and on behalf of the ORLY
GENGER 1993 Trust,

INDEX NO.   651089/2010

Plaintiffs,

**THIRD AMENDED AND
SUPPLEMENTAL COMPLAINT**

-against-

SAGI GENGER, TPR INVESTMENT
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE
FANG, Individually and as Trustee of THE
SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR
INVESTORS, LLC, NEW TR EQUITY I,
LLC, NEW TR EQUITY II, LLC, JULES
TRUMP, EDDIE TRUMP, MARK HIRSCH,
and TRANS-RESOURCES, INC.

Defendants.

Plaintiffs Arie Genger and Orly Genger, in her individual capacity and on behalf of the

Orly Genger 1993 Trust, by their respective attorneys, for their Third Amended and

Supplemental Complaint against the defendants in this action allege, on information and belief,

as follows:

## I.    THE PARTIES

1.     Plaintiff Arie Genger ("Arie") is a resident of the State of Florida, and the father

of the Plaintiff Orly Genger ("Orly") and the defendant Sagi Genger ("Sagi").

2.     Plaintiff Orly Genger is the adult daughter of Arie Genger and Dalia Genger, and

the beneficiary of the Orly Trust, and a resident of the State of New York and is the beneficiary

of the Orly Genger 1993 Trust (the "Orly Trust"). She brings this action on behalf of the Orly

Trust as the beneficiary of the Orly Trust to protect her interests thereunder.

3.      Defendant Sagi Genger ("Sagi") is the estranged adult son of plaintiff Arie Genger and Defendant Dalia Genger, and is a resident of the City, County, and State of New York, and maintains an office at 1211 Park Avenue, New York, NY 10128.

4.      Defendant TPR Investment Associates, Inc. ("TPR") is a Delaware Corporation with a principal office located at 1211 Park Avenue, New York, NY 10128.

5.      At all relevant times to this Complaint Sagi is the President of defendant TPR and continues to be a controlling member of TPR's Board of Directors.

6.      Defendant Dalia Genger ("Dalia") is the mother of Sagi Genger and Orly Genger and the former wife of the Plaintiff Arie Genger, and is a resident of the City, County and State of New York.  Dalia is the putative trustee of the Orly Trust and at relevant times to this Complaint is believed to have been a director of TPR.

7.      Defendant The Sagi Genger 1993 Trust ("Sagi Trust") is a trust entity, and the beneficiary of the Sagi Trust is Sagi.

8.      Defendant Rochelle Fang ("Fang") is the mother-in-law of the Defendant Sagi Genger and was the Trustee of the Sagi Trust during relevant periods in 2008, and is a resident of the City, County and State of New York.

9.      Defendant Glenclova Investment Company ("Glenclova") is a Cayman Islands company with a business address in the Bahamas, and an owner of common stock of Trans-Resources, Inc. ("TRI").  On information and belief Glenclova is in turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

10.     Defendant TR Investors, LLC ("TR Investors") is a New Jersey Limited Liability Company and an owner of common stock of TRI.  On information and belief TR Investors is in

2

turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

11.     Together Glenclova and TR Investors are controlled by the Trump Group of South Africa and are collectively referred to herein as the "Trump Group".

12.     Defendant New TR Equity I, LLC ("New TR I") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

13.     Defendant New TR Equity II, LLC ("New TR II") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

14.     Defendant Jules Trump is a resident of Florida, and an officer and director of Glenclova.

15.     Defendant Eddie Trump is a resident of Florida, and an officer and director of Glenclova.

16.     Defendant Mark Hirsch is a resident of New York, and an officer and director of Glenclova.

17.     The Trump Group, New TR I , New TR II, Jules Trump, Eddie Trump and Mark Hirsch  are referred to herein as the "Trump Parties."

18.     Defendant Trans-Resources, Inc. ("TRI") is a Delaware Corporation which is doing business in the City, County and State of New York, with its principal place of business located in the City, County and State of New York.

19.     The claims set forth in this Complaint arise from the conduct of each of the defendants, or their respective agents and co-conspirators, who committed one or more (i) tortious acts within the state, (ii) tortious acts without New York State causing injury to the

3

Plaintiffs or their property within New York State, and (iii) breaches of contract or fiduciary duty arising from contractual obligations, transactions and fiduciary obligations performed or to be performed in New York State.

## II.    NATURE OF THE CASE

20.    In this case, Plaintiffs Arie and Orly, in her individual capacity and on behalf of the Orly Trust, are seeking declaratory, injunctive, and other equitable relief, as well as additional compensatory damages in an amount yet to be determined arising from, inter alia, the loss of Arie's voting control of TRI and the tortious conduct of the defendants as set forth herein, in connection with the Trump Parties' campaign to take over and dilute the value of plaintiffs' interests in TRI, a company founded by Arie nearly three decades ago, including the defendants' wrongful, concerted efforts to strip Arie of his ownership and control of 52.85% of the shares of TRI's common stock, including the Orly Trust's interest in a portion of this TRI stock, and to oust Arie from his management control of TRI—all in an audacious series of breaches of contractual, fiduciary and legal obligations giving rise to each of the causes of action alleged in this Complaint.

## III.    FACTS RELEVANT TO ALL CLAIMS

### A.    <u>Background</u>

21.    The Plaintiff Arie is the founder and former Chairman of TRI, a private corporation which, through its subsidiaries, is a leading distributor and manufacturer of agricultural fertilizer worldwide.

22.    Arie founded TRI in 1985. Until 2001, TRI was wholly-owned by TPR Investment Associates, Inc. ("TPR"), a Genger family corporation established by Arie.

23.     Prior to October 30, 2004, TPR was controlled by Plaintiff Arie who owned 51% of TPR stock.

24.     Prior to October 30, 2004, Arie maintained majority control of TRI through his 51% majority ownership and control of TPR.

25.     The minority 49% interest in TPR, prior to October 30, 2004, was owned by D&K, Ltd. Partnership ("D&K"), also a Genger family company, which was in turn owned by Arie's wife, Dalia, (4%), the Sagi Trust and the Orly Trust (48% each).

26.     The Sagi and Orly Trusts were established in 1993 by Arie as part of a family estate plan.

27.     In 2001, defendants Glenclova and TR Investors became minority shareholders of TRI, acquiring approximately 47.15% of TRI common stock.

28.     As a result of the Trump Group acquiring 47.15% of TRI common stock, TPR became the owner of 52.85% of TRI stock with Arie maintaining a 51% controlling interest in TPR.  Through his 51% ownership of TPR, Arie maintained control of a majority 52.85% interest in TRI, the company he founded.

29.     When the Trump Group became a minority shareholder of TRI, the Trump Group and TPR entered into the 2001 TRI Stockholders Agreement, dated March 30, 2001 (the "2001 TRI Stockholders Agreement") which, among other things, was intended to ensure that Arie (through his controlling interest in TPR) would continue to control the majority voting rights of TRI shares for the duration of his life.

5

30.     The 2001 TRI Stockholders Agreement specifically recognized that Arie was the
51% owner of TPR and that Dalia and the Orly Trust and the Sagi Trust through the D&K
Limited Partnership together owned 49% of TPR.

31.     The 2001 TRI Stockholders Agreement contains certain provisions restricting
the transfer of TPR's majority interest in TRI to someone other than Arie during his lifetime,
except under certain enumerated conditions intended to ensure that Arie, as the majority
shareholder of TPR, would maintain control over 52.85% of TRI shares during his life.  The
2001 Stockholders Agreement specifically provides that exclusive jurisdiction over disputes
relating to this 2001 TRI Stockholders Agreement shall be in Federal courts or New York State
courts sitting in the City, State, and County of New York. The full terms and conditions of the
2001 TRI Stockholders Agreement are incorporated herein by reference.

**B.      The Genger Divorce and Court-Ordered Stipulation of Settlement**

32.     In 2002, Dalia and Arie became embroiled in a bitter divorce action venued in the
Supreme Court, New York County, entitled *Dalia Genger v. Arie Genger*, Index No. 302436-
2002 ("Genger Divorce Action").

33.     In October of 2004, Dalia and Arie agreed to a Stipulation of Settlement, which
was incorporated into a Judgment of Divorce in the Genger Divorce Action on January 7, 2005
("Stipulation of Settlement"), attached hereto as Exhibit A.  This Court-Ordered Stipulation of
Settlement, among other things equitably distributed between Arie and Dalia various marital
assets, including the ownership interests in the family holding company TPR which then held
52.85% of TRI common stock which was controlled by Arie through his control of TPR.
Pursuant to the terms of the Judgment of Divorce, the New York State Supreme Court retained

6

jurisdiction over the parties with respect to the enforcement of the terms of the Stipulation of Settlement.

34.    Pursuant to the terms of the Stipulation of Settlement and certain 2004 TPR Transaction Documents (described below) implementing the Stipulation of Settlement, it was agreed by and among Arie, Dalia, Sagi, Orly, the Orly Trust, and the Sagi Trust that as part of the settlement of the Genger Divorce Action, that Arie would transfer his 51% interest in the TPR marital asset to Dalia, in consideration of TPR concurrently divesting itself of its 52.85% majority interest in TRI on the following terms and conditions, which were all part of a single integrated transaction:

  i.  The defendant Sagi would become the President of TPR;

  ii.  TPR, by Sagi as President of TPR, would transfer to the plaintiff Arie direct ownership of 794.40 shares of TRI common stock representing 13.99468% of the common stock of TRI;

  iii.  TPR, by Sagi as President of TPR, would transfer to each of the Sagi Trust and Orly Trust, record ownership of 1,102.80 shares (or 19.42766 % each) of TRI stock, subject to and on the further conditions that:

    (a) the Sagi Trust and the Orly Trust would each execute and deliver a 2004 Voting Trust Agreement to Arie which provides further that:

      (i) the Sagi Trust and the Orly Trust would immediately execute and deliver to Arie an irrevocable voting proxy ("Putative Irrevocable Proxies") intended to ensure that Arie would maintain voting control over the Sagi Trust TRI shares and the Orly Trust TRI Shares for the duration of Arie's life, and

      (ii) in the event that the Putative Irrevocable Proxies granted by the Sagi Trust and the Orly Trust to Arie were ever held to be invalid then:

        (1) a Back-up Voting Trust Agreement would be entered into promptly between each of the Sagi and Orly Trusts and Arie which:

7

(a) **grants Arie the right to vote the Orly Trust and Sagi Trust TRI shares for the duration of Arie's life,**

(b) provides that Arie is entitled to keep possession of the Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust Agreement in a form attached to the 2004 Voting Trust Agreement, and

(c) provides that the Orly and Sagi Trust TRI shares would not be sold without a prior Court order,

and the 2004 Voting Trust Agreement further provides that:

(2) **pending the execution of the Back–up Voting Trust Agreement, the Orly and Sagi Trusts would be obligated to vote the Orly Trust and Sagi Trust Shares as directed by Arie during his lifetime.**

**Id.(emphasis added)**

35.    The Court-Ordered Stipulation of Settlement in the Genger Divorce Action is

attached as Exhibit A hereto.

36.    Article II of the Stipulation of Settlement in the Divorce Action, entitled

"Distribution of Assets," specifically provides, in pertinent part, as follows:

[2. (a)] "(ii) [Dalia] shall receive . . . sole ownership of the husband's [Arie's] two hundred and fifty (250) shares of common stock of TPR Investment Associates, Inc. ("TPR"), . . . which represents fifty-one percent (51%) of the issued and outstanding shares of common stock of TPR (exclusive of the 1.96% ownership of TPR, which the wife [Dalia] owns indirectly through her general partnership interests in D&K [partnership].

\*   \*   \*

"9. (a) TPR owns 3,000 shares of stock in Trans-Resources, Inc. ("TRI Stock") . . . . <u>Concurrently with the execution of this agreement, the TRI Stock shall be distributed as follows:</u>

**"(i) The husband [Arie], shall receive 794.40 shares of the TRI Stock, representing 13.99468% of the common stock of TRI;**

8

**(ii) Each of Sagi Genger and Orly Genger, will receive in trust 1,102.80 shares of TRI Stock representing 19.42766% of the common stock of TRI for each of Sagi and Orly, and such trusts will simultaneously therewith execute and deliver irrevocable proxies to the husband for all of the TRI Stock owned by the trusts; and**

**"(c)   Concurrently with the execution of this Agreement, each of the Husband and Wife will execute and deliver or cause TPR to execute and deliver (i) all documents reasonably necessary to effect the transfers required by subparagraph (a) of this Section 9, and (ii) duly executed stock powers to transfer the shares as required by subparagraph (a) of this Section 9.**

\*   \*   \*

"(e) Following the foregoing transfers of the TRI Stock, the wife [Dalia] will have no ownership interest in TRI."

(Stipulation of Settlement, Exhibit A hereto, Article II, paragraph 2(a) (ii), p.5, and paragraph 9 (a), (c) & (e) at pp. 13, 14) (emphasis added).

37.   The Stipulation of Settlement also provides that this TPR/TRI transaction was a fundamental part of the Stipulation of Settlement, and specifically states in pertinent part, in bold and capital letter type:

**"A FUNDAMENTAL PART OF THIS AGREEMENT IS THE HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP OF SHARES OF COMMON STOCK IN TPR, AND THE TRANSFER OF SUCH OWNERSHIP TO THE WIFE."**

Stipulation of Settlement, Exhibit A hereto, Article 3, para. 1.

38.   The Stipulation of Settlement also included an express reformation clause which provides that in the event that any term of the Stipulation of Settlement were to be voided by a court of competent jurisdiction for any reason, then either Dalia or Arie would be entitled to seek court-ordered reformation of the Stipulation of Settlement in a New York Court to give effect to

9

the intent of the parties to the fullest extent permitted by the laws of the State of New York.  This

reformation clause of the Stipulation of Settlement provides:

## "ARTICLE XVI

### POSSIBLE INVALIDITY

"If any provision of this [Stipulation of Settlement], for any reason
whatsoever, be declared . . . unenforceable by any Court of
competent jurisdiction . . . the remainder of this Agreement and
the application of such provision to any person or situations, other
than those as to which such provision may have been invalid or
unenforceable shall not be affected thereby and shall continue to be
enforced to the fullest extent that such severance of the invalid
portions is possible without vitiating the original intent and
purposes and economic intentions of the parties (the "Original
Intent"), as herein set forth... .  **In the event a provision is
superseded under this [Stipulation of Settlement], either party
may seek reformation of the affected provision in any court of
competent jurisdiction which shall be empowered to revise the
provision to reflect the parties' Original Intent to the greatest
extent possible, consistent with New York law.** It is the
intention of the parties hereto that this provision may be enforced
in equity in addition to, and not to the exclusion of, any other
remedies which may be available to the parties."

(Stipulation of Settlement, ARTICLE XVI, Exhibit A at pages 47-48) (emphasis added)).

39.    Dalia was represented by separate, independent legal counsel in connection with

the negotiation and her execution of the Stipulation of Settlement.

40.    Dalia, through her counsel, received a complete copy of the 2001 TRI

Stockholders Agreement prior to the execution of the Stipulation of Settlement.

41.    Sagi had full knowledge of the terms of the Stipulation of Settlement prior to, and

at the time that it was negotiated and executed, and was named as a fiduciary with regard to

certain marital property distributed or to be distributed under the Stipulation of Settlement.

42.    Sagi and his own counsel were provided with a full and complete copy of the 2001 TRI Stockholders Agreement prior to the execution of the Stipulation of Settlement.

43.    Edward Klimmerman, a partner at Sonnenschein, Nath & Rosenthal, LLP (now known as SNR Denton), represented Arie in the Genger Divorce Action, had full knowledge of the negotiation and terms of the Stipulation of Settlement at the time the Stipulation of Settlement was executed.  Mr. Klimmerman signed the Stipulation of Settlement as a witness. Mr. Klimmerman was also legal counsel for TRI and TPR at the time the Stipulation of Settlement was executed.

44.    As counsel for TRI and TPR, Mr. Klimmerman participated in the actual drafting of the 2001 TRI Stockholders Agreement.  As Arie's counsel in the Genger Divorce Action, he did not advise Arie that anything in the Stipulation of Settlement violated any term of the 2001 TRI Stockholders Agreement between TPR and the Trump Group.

45.    Arie reasonably believed that the transfers set forth in the 2004 Transfer Documents and Court-Ordered Stipulation of Settlement were valid and enforceable.

46.    Dalia and her legal representatives reasonably believed that the 2004 Transfers provided for in the Stipulation of Settlement were valid and enforceable at the time Dalia entered into the Stipulation of Settlement.

47.    Defendant Jules Trump, a representative of the Trump Group was aware of the Genger Divorce Action, and prior to the execution of the Stipulation of Settlement testified as a witness in the Genger Divorce Action in connection with the ownership of TRI shares.

C.    **The 2004 TPR Transfer of TRI Shares Pursuant to the Stipulation of Settlement**

48.    To implement the TPR and TRI share transfer provisions in the Stipulation of

Settlement, Arie, the Sagi Trust, the Orly Trust and TPR, concurrently with the execution of the

Stipulation of Settlement, entered into the following "2004 TPR Transaction Documents" in

accordance with the express terms and intent set forth in the Stipulation of Settlement:

> (i) a 2004 TPR Agreement to Transfer TRI Shares, dated
> October 29, 2004 (the "2004 TPR Transfer Agreement", attached
> hereto as Exhibit B); and

> (ii) a 2004 Voting Trust Agreement, dated October 29,
> 2004 (the "2004 Voting Trust Agreement", attached hereto as
> Exhibit C), which attached:

> (a) Executed Documents referred to as Putative Irrevocable
> Proxies, dated October 29, 2004, executed by the Sagi Trust and
> the Orly Trust ("Putative Irrevocable Proxies", attached hereto as
> Exhibit D) which by their specific terms purported to grant to the
> Plaintiff Arie the right to control and vote the Sagi Trust TRI
> shares and the Orly Trust TRI shares for the duration of his life,
> and

> (b) a form Back-up Voting Trust Agreements ("Back up
> Voting Trust Agreements", attached here to Exhibit E), which
> were to be executed promptly by the Sagi Trust and the Orly Trust
> in the event that the Putative Irrevocable Proxies granted by the
> Sagi Trust and the Orly Trust to Arie were ever held to be invalid,
> and provided that:

> (i) the Sagi Trust and the Orly Trust were required
> to vote the TRI shares in accordance with Arie's directions
> pending the execution of the Back-up Voting Trust Agreements in
> accordance with the express intent in the Stipulation of Settlement
> that Arie was to maintain voting control of the Sagi Trust and Orly
> Trust TRI shares for the duration of his life;

> (ii) Arie would be entitled to keep possession of the
> Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust
> Agreement in the form attached to the 2004 Voting Trust
> Agreement; and

(iii) the Orly and Sagi Trust TRI shares would not
be sold without a prior Court Order.

49.     Each of the 2004 Transaction Documents confirm the stated intention of the

parties to the Stipulation of Settlement and 2004 Transaction Documents that Arie, for the

duration of his life, would continue to have voting control over 52.85% of the outstanding shares

of TRI that were previously owned by TPR and controlled in turn by Arie through his 51%

ownership of TPR.

**D.     The 2004 TPR Transfer Agreement-Exhibit B**

50.     The 2004 Transfer Agreement executed by Sagi himself on behalf of TPR,

provides :

> "This letter will set forth our agreement pursuant to which you will
> purchase the 3,000 shares of common stock ("the Shares") of
> Trans-Resources, Inc. ("TRI") owned by TPR Investment
> Associates, Inc. ("TPR").  TPR hereby sells, transfers and conveys
> the Shares to you as follows:
>
>> (i)     794.40 shares to Arie Genger;
>>
>> (ii)    1,102.80 Shares to the Sagi Genger 1993 Trust, and
>>
>> (iii)   1,102.80 Shares to the Orly Genger 1993 Trust.
>
> *   *   *
>
> "The Shares represent 52.85% of the issued and outstanding shares
> of TRI.  The Shares are being transferred hereunder free and clear
> of any liens, claims or encumbrances and **such transfer does not
> violate the Certificate of Incorporation of TPR or any
> agreement to which TPR is subject.**
>
> **"The trustees of the Sagi Genger 1993 Trust and of the Orly
> Genger 1993 Trust ("Trusts") have agreed to execute on behalf
> of the Trusts (i) an Irrevocable Proxy to appoint Arie Genger
> to vote the Shares owned by the Trusts and (ii) a voting trust
> letter agreement, copies of which are annexed hereto."**

13

> **"In case, at any time hereinafter, any further action is
> necessary or desirable to carry out the purposes of this Letter
> Agreement, each of the parties hereto shall take or cause to be
> taken all necessary action,** including, without limitation, the
> execution and delivery of such further instruments and documents
> which may be reasonably requested by any party for such purpose
> or otherwise **to complete or perfect the transactions
> contemplated hereby**."
>
> This Letter Agreement shall be governed by the laws of the State
> of New York without regard to conflicts of law principles.

(2004 TPR Transfer Agreement, Exhibit B) (emphasis added)

### E.    The 2004 Voting Trust Agreements (Exhibit C hereto)

51.    In accordance with the terms of the Stipulation of Settlement (Exhibit A) and the

2004 TPR Transfer Agreement (Exhibit B), Arie and the Sagi and Orly Trusts, respectively,

entered into identical 2004 Voting Trust Letter Agreements in favor of Arie (Exhibit C) which

provide as follows:

> "In connection with the transfer to the [Sagi and Orly Trusts] of
> 1,102.80 shares [each] of common stock (the "Shares") of Trans-
> Resources, Inc. (TRI) **pursuant to the terms and conditions of
> the Stipulation of Settlement of even date herewith,** the [Sagi
> and Orly] trust is [each] granting to Arie Genger an irrevocable
> proxy ("the Proxy") for the shares, a copy of which is annexed
> hereto.

(Exhibit C)(emphasis added).

### F.    The 2004 Putative Irrevocable Proxies Executed By The Sagi and Orly Trusts (Exhibit D, hereto)

52.    In accordance with the 2004 TPR Transfer Agreement, the Stipulation of

Settlement, and the 2004 Voting Trust Agreement, the Sagi and Orly Trusts executed two

identical Putative Irrevocable Proxies, each of which states, in relevant part, that:

> "[The Sagi Trust and Orly Trust, each respectively], ("the Trust")
> being the current record and beneficial owner of 1,102.80 shares of
> common stock of [TRI] **does hereby constitute and appoint Arie**

14

> **Genger, Chairman of the Board, Chief Executive Officer, and**
> **owner of approximately fourteen percent (14%) of the shares**
> **of common stock of TRI to vote as its proxy, all shares of**
> **common stock of TRI** which are now or hereafter owned by
> **the Trust**, at any and all meetings of the stockholders of TRI,
> regular or special, or by consent in lieu of meeting or any
> adjournments thereof in the same manner and to the same extent
> that the Trust might were the Trust present at said meeting (or
> executing such consent), upon any issue or proposal which may be
> brought before  such meeting or by such consent.
>
> **"This Irrevocable Proxy shall he deemed coupled with an**
> **interest and be irrevocable from the date hereof, and shall**
> **continue for the duration of Arie Genger's life."**

(Exhibit D)(emphasis added).

53.     The 2004 Voting Trust Agreement further provides that **in the event that the**

**Putative Irrevocable Proxies were ever declared invalid**, the Orly and Sagi Trusts would be

obligated to enter into a Back-up Voting Trust Agreement (Exhibit E) to assure that Arie would

maintain voting control over a majority of TRI shares for the duration of his life.  This part of the

2004 Voting Trust Agreement, executed by the Sagi Trust and the Orly Trust, provides:

> **"In the event that for any reason the Proxy is declared invalid**
> **and is no longer in effect, the Trust agrees, as promptly as**
> **practicable, to enter into a Voting Trust Agreement (the**
> **"Voting Agreement") with Arie Genger as the voting trustee,**
> **which shall be substantially in the form annexed hereto.**
> **During the time the Proxy is not in effect and prior to the time**
> **the Voting Agreement is entered into, the Sagi Trust agrees to**
> **vote the shares as directed in writing by Arie Genger."**

(2004 Voting Trust Agreement, Exhibit C ) (emphasis added).

**G.     Back-Up Voting Trust Agreement –(Exhibit E hereto)**

54.     The Backup Voting Trust Agreement, which springs into effect upon the Putative

Irrevocable Proxies being voided, provides:

15

"The Trust Securities [the Sagi and Orly TRI Shares subject to the Voting Trust] shall be held by the Trustee [Arie Genger] for the purposes of and in accordance with this Agreement <u>and none of the Trust Securities shall be sold or otherwise disposed of by the Trustee except as herein expressly provided or in accordance with a final order of any Court or administrative agency with jurisdiction thereover.</u>"

\* \* \*

"This Agreement shall continue in effect for the duration of Arie Genger's Life"

Exhibit E. (emphasis added)

55.     In order to ensure that he maintained absolute control of the TRI shares for the duration of his life, Arie never delivered physical copies of TPR's TRI shares to the Orly or Sagi Trusts.

### H.     The Intent of the Parties

56.     The written 2004 Transaction Documents and the Stipulation of Settlement reflect the stated intention of all the parties to these collective documents, <u>to wit</u>, that in order to resolve the contested Genger Divorce Action, Arie agreed as part of the distribution of marital assets to transfer his 51% interest in the family holding company, TPR, to Dalia, in exchange for Dalia agreeing that TPR would concurrently divest itself of its 52.85% interest in the common stock of TRI by distributing TPR's 52.85% majority interest in TRI to Arie (14%), the Sagi Trust (19.425%), and the Orly Trust (19.425%) each, **on the express further condition that Arie maintain voting rights for the Sagi Trust and Orly Trust TRI shares for the duration of his life.**

57.     Arie, Dalia, Sagi and Orly each reasonably believed that the 2004 Transfers provided for in the Stipulation of Settlement were valid and enforceable.

16

58.     Arie, Dalia, Sagi and Orly each reasonably believed that the Putative Irrevocable Proxies and Voting Trust Agreements were valid and assured that Arie would be able to maintain 58.85% voting control for the duration of his life.

59.     Accordingly, the concurrently executed integrated 2004 Transfer Documents were intended to implement the terms of the Stipulation of Settlement which provided expressly that Arie was to retain his 52.85% voting control over TRI and concomitantly continue to control the management and Board of TRI during his lifetime.

60.     It was also the parties' stated intention, and all parties reasonably believed, that the terms of the court-ordered Stipulation of Settlement with Dalia would not violate the terms or intent of the 2001 TRI Stockholders Agreement because Arie would still control what had been TPR's voting majority of TRI shares.

61.     The Genger Divorce Action was not concealed from TRI, the Trump Group, or the Trump Parties at any time.

62.     The 2004 transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust were reflected in the books and records of TRI.

63.     Prior to 2008, Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group between 2004 and 2008 had access to the books and records of TRI.

64.     Between 2004 and 2008, as a Director of TRI, Jules Trump and Mark Hirsch, each had a fiduciary duty and legal duty of reasonable care to the record and beneficial owners, including TPR and TRI, to know the identity of all TRI shareholders of record as set forth in the books and records of TRI- a close corporation.

17

65.     As a Directors of TRI, Jules Trump, and Mark Hirsch, each individually and on behalf of TRI, had a fiduciary and legal duty of reasonable care to TPR and Arie to read all corporate Board minutes and other documents presented to the Directors and/or shareholders of TRI, in their entirety, prior to signing such documents.

66.     Prior to 2008, the books and records of TRI show that:

(i) Arie was record owner of 794.40 shares of TRI, representing 13.9946% of the common stock of TRI;

(ii) the Sagi Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI; and

(iii) the Orly Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI.

67.     Prior to 2008, the 2004 Transfers and the record ownership of TRI shares was known by:

(i) the officers and directors of TRI, in addition to Arie

(ii) TRI's legal counsel; and

(iii) TRI's Certified Public Accountant.

68.     Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group executed corporate TRI documents as Director and/or on behalf of a shareholder of TRI which indicated that Arie, the Orly Trust and the Sagi Trust were the record owners of TRI shares.

69.     The terms of the Stipulation of Settlement relating to the distribution of TPR and TRI shares as marital assets in connection with the Genger Divorce Action were not in any way or at any time concealed from TRI, the Trump Group, or the Trump Parties.

70.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could involve in some way the equitable distribution of TPR shares owned by Arie as part of the divorce action.

71.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way the value of TPR's ownership of TRI shares.

72.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way Arie's management and control over TRI, the company that he had founded and managed since 1985.

73.     Prior to 2008, Jules Trump knew that ownership of TPR, as a marital asset which owned 52.85% of TRI shares, was a major asset and was the subject of a claim by Dalia for equitable distribution in the Genger Divorce Action.

74.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action would involve in some way the equitable distribution of TPR assets, including Arie's 51% majority ownership of TPR.

75.     Prior to 2008, the Trump Group, through Jules Trump who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could

19

involve D&K Limited Partnership, which was identified in the 2001 TRI Stockholders Agreement as an owner of 49% of TPR (the majority Shareholder of TRI) and further disclosed that in turn this 49% minority ownership of TPR by D&K was owned by Arie's wife Dalia (4%) the Sagi Trust (48%) and the Orly Trust (48%), and that these Trust interests could be effected by the equitable distribution of TPR assets as part of the Genger Divorce Action.

76.     The Trump Group knew that the 2001 TRI Stockholders Agreement did not contain an express provision setting forth the rights and obligations of TPR, Arie or the Trump Group in the event of a contested divorce involving Arie's ownership of TPR shares as marital property, including TPR's ownership of TRI shares under New York's equitable distribution laws or otherwise.

77.     Prior to 2008, Arie had reason to believe that The Trump Group, through Jules Trump, and otherwise, had notice of the 2004 Transfers.

78.     Prior to 2008, Arie had reason to believe that The Trump Group had notice of the 2004 Transfers which were reflected in TRI corporate documents.

79.     Prior to 2008, the Trump Group and Jules Trump, in particular, had knowledge of facts in 2002-2004 including, but not limited, to the fact that Arie was involved in a bitter contested divorce, and that the issue of Arie's ownership interests in TRI, through TPR or otherwise, was an issue raised in the Genger Divorce Action.

80.     Between 2004 and 2008, Directors of TRI, its legal counsel, Secretary, as well as its Controller, knew of the 2004 transfers.

81.     Between 2004 and 2008, TRI, under Arie's management, reported the new company ownership resulting from the 2004 transfers to its lead bank, the IRS, and TRI's insurance company.

82.     Between October 2004 and August of 2008 nothing prevented the Trump Group, Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia,  Sagi, the Sagi Trust, the Orly Trust, or D&K, concerning the effect, if any, that the Genger Divorce Action, or any judgment or resolution of the Genger Divorce Action had, would or could have, on (i) the ownership of TPR, (ii) Arie's ownership of a majority interest of TPR, (iii) TPR's ownership of TRI, (iv) Dalia's interest in D&K minority ownership of TRI, or the rights of the Sagi Trust or the Orly Trust as limited partners of D&K which owned approximately 49% each of TPR -- which ownership was acknowledged by the Trump Group in the 2001 TRI Stockholders Agreement.

83.     Between October 2004 and August of 2008 nothing prevented the Trump Group, Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia, Sagi, the Sagi Trust, the Orly Trust, or D&K as to the identity of the record owners of TRI.

84.     Jules Trump, Eddie Trump and Mark Hirsch (an attorney) at all times relevant to this complaint were sophisticated business individuals, with special expertise in corporate governance and ownership.

85.     At all times relevant to this action the Trump Parties had access to independent legal counsel.

86.     Prior to 2008, the Trump Group, by Jules Trump, and otherwise, acted with willful blindness and indifference to facts which put The Trump Group on notice of (i) the 2004 Transfers, and (ii) that Arie, the Sagi Trust and the Orly Trust were record owners of their respective TRI shares.

87.     The Trump Group, by Jules Trump, and otherwise, waived any objection to the 2004 Transfers.

88.     Between 2004 and 2008, under Arie's management, TRI's business performance improved consistently without any complaint or objection by TRI's Board of Directors including but not limited to representatives of the Trump Group.

**I.      The Trump Parties' 2008 Scheme and Conspiracy to Seize Majority Control of TRI, Squeeze Out Arie as an Officer, Director and Shareholder of TRI and Dilute the Value of Arie's, Orly's and the Orly Trust's Interests in the Affected TRI Shares**

89.     There was no hint of any substantial disagreement between Arie and the Trump Group relating to the Genger Divorce Action, or otherwise, until June of 2008, when TRI's value increased substantially as a result of improved performance.

90.     In the early Spring of 2008, TRI was facing a threat of foreclosure of one of its major operating units by Bank Hapoalim, a long-time lender of TRI.

91.     To address this foreclosure threat, Arie and the Trump Group explored the possibility of a sale of assets and restructuring plan involving the spin-off of all of TRI's North American assets to a separate entity and a capital loan by the Trump Group into a residual TRI to retire the Bank Hapoalim debt in exchange for increasing the equity position of the Trump Group in the restructured TRI so that the Trump Group would obtain a majority position (the "Funding Plan").

22

92.     Had the Funding Plan been implemented, in return for providing funding Jules and Eddie Trump through TR-I and TR-II would, for the first time, have been permitted to obtain a direct ownership interest in TRI, and the Trump Parties, under the Funding Plan, would have obtained majority control over TRI, the company that Arie had founded and worked so hard to make succeed.

93.     TRI's legal counsel advised that it would be necessary for a special committee of the Board to be constituted  in order for the Board to approve the Funding Plan without the vote of Jules Trump who was an interested Director with a conflict of interest.

94.     Despite requests from Arie to constitute such a committee, the Trump Group Directors failed to agree to the appointment of such committee.

95.     The Board of TRI never constituted a special committee in order for the Board to approve the Funding Plan.

96.     The implementation of the Funding Plan was also subject to other conditions relating to the value of the transaction which conditions were never met.

97.     While the proposed Funding Plan was being worked on, the financial condition of TRI began to improve substantially.  By late June 2004, TRI was generating positive cash flow of $15-20 million per month.  This represented a dramatic improvement in TRI's earnings within a matter of months in 2008, and rendered the Funding Plan unnecessary.

98.     As a result, there was no longer a need for TRI or Arie to move forward with the Trump Group Funding Plan that would have given the Trump Parties' majority control of TRI.

99.     To proceed with the Funding Agreement would have diluted the shares of existing shareholders and cause TRI to pay the Trump Group unreasonable fees for a loan that was not needed.

100.    Based on the advice of TRI's Delaware corporate counsel concerning the establishment of an independent committee of the Board to approve the Funding Plan, which the Trump Group refused to empanel, and the fact such a Funding Plan was no longer necessary because of improved performance of TRI which permitted the satisfaction of the Bank Hapoalim loan, the Funding Plan was rejected and the Bank Hapoalim loan satisfied with TRI's own substantially improved earnings without the need for funding from the Trump Parties or any other third-party.

101.    On information and belief, the Bank Haopolim's threat of foreclosure and the Funding Plan takeover proposed by the Trump Group were also engineered by Jules Trump, individually, and on behalf of the Trump Group with the aid, assistance and further illegal conduct of the Trump Group and a principal officer of Bank Haopolim with whom the Trump Group had other business entanglements.

102.    Thwarted in their effort to take over the controlling interest in TRI through the rejected Funding Plan, the Trump Group, Mark Hirsch, Eddie Trump, and Jules Trump formulated a further illegal scheme and plan to take over the then very profitable TRI, and oust Arie as its CEO, and steal the Genger family TRI shares at a fraction of their value.

103.    In furtherance of this plan, the Trump Group leveled an extortionate threat at Arie demanding that unless Arie agreed to turn over majority control of TRI to the Trump Group pursuant to the Funding Plan (which was no longer necessary ), the Trump Group would declare

24

that the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust under the

Stipulation of Settlement were void under the 2001 TRI Stockholders Agreement even though

Arie as a permitted Transferee held 14% of TRI outright, and had received a Voting Trust

Agreement and Putative Irrevocable Proxies from the Sagi Trust and the Orly Trust which, on

their face, gave Arie the right during his lifetime to control the management of TRI, and vote the

same 52.85% shares of TRI stock that had been controlled by Arie through his 51% ownership of

TPR prior to the Stipulation of Settlement and the execution of the 2004 Transfer Documents.

Thus, there was virtually no effective difference in Arie's control of TRI Shares as between his

majority control of TPR prior to the execution of the Stipulation of Settlement, and the intended

control that Arie would exercise after the Stipulation of Settlement and 2004 Transfer

Documents were executed.

104. At the time they made this threat in 2008, the Trump Parties, among other things,

knew that:

(i) the intent of the parties pursuant to the 2001 TRI Stockholders Agreement in

restricting certain transfers to Genger family members was to ensure that (a) Arie, personally,

would continue to have management and majority shareholder voting control over TPR's TRI

shares for the duration of his life, and (b) prevent any other Genger family member from having

any management or voting control over TRI during Arie's lifetime;

(ii) pursuant to the terms of the Stipulation of Settlement and the 2004 TPR-TRI

Transfer Documents Arie, Dalia, Orly and Sagi, specifically intended to preserve Arie's

management and voting control of TRI, in the context of resolving the equitable distribution of

marital property issues concerning TPR raised in the Genger Divorce Action;

(iii) that as a condition for Arie transferring his 51% interest in TPR to Dalia in the Genger Divorce Action, it was intended that pursuant to the Stipulation of Settlement and 2004 Transaction Documents Arie would receive valid Putative Irrevocable Proxies and Back-up Voting Trust Agreements from the Sagi Trust and the Orly Trust designed to ensure that Arie would retain voting control over a majority of TRI shares for the duration of his life even if the Putative Irrevocable Proxies were held to be invalid; and

(iv) that if the 2004 TPR transfer of TRI shares were voided, as threatened by the Trump Group, then:

(a)     52.85% of TRI shares would revert to TPR, which would be unjustly enriched because TPR, under the Stipulation of Settlement and implementing 2004 Transaction Documents, had already divested itself of those TRI shares in consideration of Arie relinquishing his 51% ownership of TPR to Dalia;

(b) that Arie would be the beneficial owners of such 3000 TRI Shares, and Arie would have the right to vote the 52.85% of TRI shares that were returned to TPR, subject to the Orly and Sagi Trust rights to receive certain of these shares upon Arie's death;

(c)     Sagi was not authorized to act on behalf of TPR to sell any of the TRI shares without the consent of Arie as the beneficial owner of the Arie TRI Shares, and the beneficial holder of the voting rights to TPR's TRI Shares;

(d)     Arie would be entitled to reform the Stipulation of Settlement, pursuant to the express terms of the Stipulation of Settlement, so that Arie would regain control of 51% of TPR's ownership and control of 52.85% of TRI's shares;

26

(e) that the New York Supreme Court under the Judgment of Divorce, had retained jurisdiction over Arie and Dalia in connection with enforcing the terms of the Stipulation of Settlement, including Arie's reformation claims; and

(f)   TPR, under Sagi's control, was not authorized to sell TRI shares to the Trump Group without the consent of Arie, as beneficial owner of TPR's record ownership of the TRI shares, in the event the 2004 Transfers were held to be invalid;

(v) that if the Putative Irrevocable Proxies (Exhibit D) were held to be invalid, that the Sagi and Orly Trust shares would be subject to the Back-Up Voting Trust Agreement Exhibit E) which was referred to in the 2004 Voting Trust Agreement (Exhibit C).

105.   Nevertheless, on August 8, 2008, the Trump Group, in furtherance of their plan to pressure Arie and take over a majority control of TRI, sent a letter to TPR asserting that it had the right under Section 3.2 of the 2001 TRI Stockholders Agreement to purchase all of the TRI shares that were the subject of the Stipulation of Settlement transfers in 2004, **at 2004 prices** – a small fraction of what is believed to have been a TRI value in excess of $1 billion in 2008, which had net after-tax income in excess of $150 million in that year.  The Trump Group provided no such letter or notice to Orly or the Orly Trust or the Sagi Trust.

106.   Three days later, on August 11, 2008, the Trump Parties, through Glenclova, commenced an action in the Federal District Court of the Southern District of New York against TPR (the "Federal Action") claiming that the transfer of the TRI shares by TPR to Arie Genger, the Orly Trust and the Sagi Trust pursuant to the express terms of the Stipulation of Settlement and 2004 Transaction Documents, was void.

107.    Notwithstanding the Trump Parties' respective specific knowledge in 2008 of the existence and terms of the Court-ordered Stipulation of Settlement and the 2004 TPR Transfer Documents, the Trump Group did not name Arie, Dalia, the Sagi Trust or the Orly Trust as parties in the Federal Action.

108.    The Trump Parties knew at the time they commenced the Federal Action that Arie was a known third party beneficiary under the 2001 TRI Stockholders Agreement and that the 2004 Transfers were approved in a Court-Ordered Stipulation of Settlement in the Genger Divorce Action, but nevertheless opposed Arie's motion to intervene in the Federal Action.

109.    The Trump Parties also knew that Sagi, as a result of the Stipulation of Settlement and 2004 TPR Transfer Documents, became the president of TPR, but that he had since become estranged from his father, and that Sagi had installed his mother-in-law Rochelle Fang as the nominal trustee of the Sagi Trust and that he exercised total dominion and control over her.

110.    The Trump Parties also knew that if the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the "So-Ordered" Stipulation of Settlement and 2004 Transfer Documents were voided, that Arie's transfer of his 51% ownership in TPR to Dalia would also have to be voided, and that as a consequence Dalia, or Sagi as her successor-in-interest, as a matter of New York law, would have to hold this 51% TPR interest in a constructive trust for the benefit of Arie with respect to TPR's ownership of the TRI Shares.

111.    The Trump Parties knew that neither TPR, nor Sagi as its President, would be authorized to sell any of TPR's shares of TRI to the Trump Group in the event that the 2004 TPR Transfers of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided because in that

28

event those TRI shares would be returned to TPR subject to a constructive trust for the benefit of Arie.

112.    Prior to August 22, 2008, the Trump Group also knew that in the event that the 2004 transfers by TPR of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided, Sagi, as the President of TPR, also owed a separate fiduciary duty to Arie and the Orly Trust with respect to the 3000 TRI shares that would revert to TPR.

113.    TPR and Sagi each had a fiduciary and contractual duty to Arie to hold any TRI shares that reverted to TPR in a constructive trust for their respective benefits as the beneficial owner of such shares, and also owed a fiduciary duty to Orly and the Orly Trust with respect to her interest in a portion of these shares.

114.    Nevertheless, in August, 2008, the Trump Group met, conspired and schemed with Sagi and/or his representatives to contrive a plan to offer Sagi approximately $26.7 million to induce Sagi to cause the Sagi Trust, through his mother-in-law Fang, to transfer to the Trump Parties the Sagi Trust's 19.425% of TRI shares that the Sagi Trust received pursuant to the Stipulation of Settlement and 2004 TPR Transaction Documents. This $26.7 million payment was a fraction of the value of those shares at that time given the performance of TRI which, in 2008 had after tax earnings of $150,000,000 of sales of approximately $1 billion.

115.    As part of this conspiracy and scheme, the purchase of the Sagi Trust Shares was to be conditioned on Sagi, purportedly as the President of TPR, further agreeing that if the Court in the Federal Action, or any other court, held that the 2004 TPR Transactions were void, then TPR would be "deemed" the Seller of the Sagi Shares, even though the Sagi Trust could keep the $26.7 million, and even though TPR had no right or authority to sell the Arie, the Sagi Trust and

29

Orly Trust Shares without the consent of Arie as beneficial owners of these respective shares, subject to Orly's interest to receive the Orly Trust TRI Shares upon Arie's death, and Arie's beneficial interest in the voting rights for the Sagi Trust, Orly Trust and Arie TRI Shares.

116.    The Trump Group defendants knew that if the $26.7 million purported purchase price of the Sagi Trust Shares was paid to the Sagi Trust that the money would need to be returned to TPR.

117.    The Trump Group defendants knew that Sagi, on behalf of TPR was not authorized to sell the Sagi Trust Shares, in the event the 2004 Transfers were declared invalid.

118.    The Trump Group defendants never sought or received a representation by TPR or Sagi that Sagi, on behalf of TPR was authorized to sell any TRI Shares to the Trump Group.

119.    The Trump Group defendants knew that Sagi on behalf of TPR was not authorized to sell any of TPR's TRI shares to the Trump Group in the event that the 2004 Shares reverted to TPR that Sagi and TPR had a fiduciary and contractual duty to protect Arie's control over the 52.85% of TRI Shares for the duration of his life.

120.    The Trump Group did not obtain a representation from Sagi or TPR as to whether any sale by the Sagi Trust or TPR would be subject to Arie's right to vote those Shares for the duration of his life in accordance with the terms of the Court-ordered Stipulation of Settlement and the 2004 Transaction Documents.

121.    As part of this conspiracy and scheme the Trump Parties also required that in order for Sagi to get the $26.7 million put in his Trust, Sagi purportedly as the President of TPR would have to further agree in a "side letter" that if the Court in the Federal Action, or any other court, held that the 2004 TPR Transactions were void, then TPR would also agree to sell the 14%

30

Arie TRI shares and the 19.425% Orly Trust Shares, which TPR had already sold to Arie and the Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents, to the Trump Parties at a price that was 60% less than the price per share to be paid to the Sagi Trust. Again, Sagi had no authority to make this sale on behalf of TPR.

122.   As part of the same conspiracy and scheme, the Trump Parties also insisted that neither the Sagi Trust nor TPR take any action to protect the voting rights of Arie that were granted to Arie by the Sagi Trust and the Orly Trust under the 2004 Voting Trust Agreements in accordance with the 2004 TPR Transfer Agreement.

123.   To induce Sagi to sell the Sagi Trust Shares to the Trump Parties, the Trump Group proposed a scheme and conspiracy that the Trump Parties knew would require Sagi to use his position as President of TPR to obtain a personal benefit by having $26.7 million paid to his Sagi Trust, while selling out Arie's and the Orly Trust's TRI shares for a fraction of their real value in an obvious breach of Sagi's fiduciary and contractual duties to Arie and the Orly Trust, which breaches of duty arose from, among other things, (i) Sagi's self-dealing transactions as an officer of TPR to get $26.7 million from the Trump Group for his Sagi Trust shares while at the same time and at the expense of Arie and the Orly Trust agreeing to sell their TRI shares at a price per share that was 60% lower than the deal Sagi was making for himself through the sale of the Sagi Trust shares to the Trump Parties, (ii) ignoring Arie's and the Orly Trust's beneficial interest in the value of TPR's ownership of specific TRI stock that TPR had already transferred to Arie and the Orly Trust for valuable consideration pursuant to the Stipulation of Settlement and the 2004 TPR Transaction documents; (iii) inducing Fang as the Trustee of the Sagi Trust to violate the 2004 Voting Trust Agreement with Arie; (iv) inducing the trustees of the Orly Trust

31

to violate their fiduciary obligations to the Orly Trust and Orly; (v) failing to protect Arie's

voting rights to 52.85% of TRI shares in accordance with the express intent and provisions of the

Stipulation of Settlement and the 2004 Transaction Documents; (vi) disposing of and

substantially devaluing the asset value of TPR's ownership of TRI shares, with knowledge that

such shares would be subject to Arie's claims for imposing a constructive trust on such shares,

reformation and/or rescission under the terms of the Stipulation of Settlement with respect to

restoring Arie's rights to a 51 % ownership of TPR insofar as TPR's ownership of TRI shares

was concerned; (vii) failing to disclose to Arie, Orly, or the Orly Trust the terms of the Trump

Parties' proposed scheme and plan to purchase the same TRI shares that TPR previously sold to

Arie and the Orly Trust under the Stipulation of Settlement and 2004 TPR Transfer Agreement,

(viii) failing to take all actions necessary to comply with the stated intentions of the parties to the

Stipulation of Settlement and 2004 Transaction Documents, and (ix) entering a self-interested,

unauthorized, ultra-vires agreement, ostensibly on behalf of TPR but in reality using his position

as President of TPR for his own personal gain to the detriment of Arie's and the Orly Trust's

legal and equitable interests in TPR's ownership of the TRI shares that were transferred to each

of them by TPR four years earlier, pursuant to the Stipulation of Settlement and 2004

Transaction Documents.

124.    In furtherance of this scheme and conspiracy, the Trump Parties, the Sagi Trust,

by Rochelle Fang, and Sagi, purportedly on behalf of TPR, executed a 2008 Stock Purchase

Agreement with the Sagi Trust without the knowledge or consent of Arie or the Orly Trust, to

sell the 1102.80 Sagi Trust Shares of TRI common stock representing 19.425% of the shares of

stock to the Trump Group and two new entities – TR I and TR II – for $26,715,416.00. ("2008 Stock Purchase Agreement", attached hereto as Exhibit F).

125.    When combined with the Trump Parties' minority share of 47.15 %, this Sagi Trust sale would give the Trump Parties a 66.575% majority and controlling voting interest in TRI, in direct derogation of the intent of the Court–Ordered Stipulation of Settlement and the Putative Irrevocable Proxies and 2004 Voting Trust Letter Agreement.

126.    The Trump Parties acknowledged the existence of the Putative Irrevocable Proxies and 2004 Voting Trust Letter Agreement in the 2008 Stock Purchase Agreement, representing and warranting that:

> "Such Purchaser hereby acknowledges receipt of copies of the irrevocable proxy dated as of October 29, 2004, issued by Seller ["Sagi Trust"] in favor of Arie Genger with respect to the shares (the "Proxy"), a backup form of voting trust agreement and voting trust certificate delivered in connection with the Proxy and the Letter Agreement dated October 29, 2004 [2004 Voting Trust Letter Agreement] with respect to the transfer of shares from TPR to Seller"

127.    The 2008 Stock Purchase Agreement also states that if the 2004 transfer of TRI shares by TPR to the Sagi Trust were determined to be void and the shares returned to TPR then **TPR** would be deemed the seller of the Sagi Trust Shares to the Trump Parties for $26.7 million, even though this $26.7 million would have already been paid to the Sagi Trust controlled by Sagi through his mother-in-law Fang.  There was no provision with respect to the reallocation of the sales proceeds to TPR.

128.    The 2008 Stock Purchase Agreement violated the terms of the  2001 Stockholders Agreement, including, but not limited to, Section 3.2 of that Agreement.

33

129.    By entering into the 2008 Stock Purchase Agreement, the Trump Group voluntarily and intentionally waived any right to purchase the Sagi Trust Shares under the 2001 Stockholders Agreement.

130.    Also through its intentional conduct, including its violation of the 2001 Stockholders Agreement, the Trump Group is estopped from utilizing any purported right to purchase under the 2001 Stockholders Agreement.

131.    In addition, Sagi, ostensibly acting for TPR, but without authority and in violation of his contractual, legal and fiduciary duties owed to Arie and Orly, signed a side letter on the very same day as the 2008 Stock Purchase Agreement that provides that if the 2004 transfer by TPR of TRI Shares to Arie and the Orly Trust under the Stipulation of Settlement and 2004 Transaction Documents were declared void, then Sagi, purportedly on behalf of TPR, would transfer the Arie Shares and Orly Trust Shares to the Trump Parties at a price per share 60% per share lower than the Sagi Trust was to receive under the 2008 Stock Purchase Agreement, which would then be deemed a sale by TPR ("2008 Stock Purchase Side Letter Agreement", attached hereto as Exhibit G).

132.    The terms of both the 2008 Stock Purchase Agreement and the Side Letter violated the 2001 Stockholders Agreement, including, but not limited to Section 3.2 of the 2001 Stockholders Agreement.

133.    The Trump Group defendants waived, and are estopped from asserting, any right under the 2001 Stockholders Agreement to purchase the Arie and Orly Trust TRI Shares from TPR.

34

134.    Neither Arie on behalf of TRI or the Board of Directors of TRI approved the transaction set forth in the 2008 Stock Purchase Agreement and Side Letter.

135.    This Side Letter was not only an insidious requirement mandated by the Trump Parties to get a majority interest in TRI for the first time, but was tantamount to a $26.7 million bribe offered by the Trump Parties to Sagi, the estranged son of Arie, to betray his father and rob his sister of the true value of their respective legal and equitable interests in the TRI stock previously owned by TPR in order for the Trump Group to completely squeeze out Arie and the Orly Trust at unconscionably low prices.

136.    At the time the Trump Parties, TR-I and TR II, the Sagi Trust and Sagi purportedly on behalf of TPR, executed the 2008 Stock Purchase Agreement, the Trump Parties also knew that if the 2004 transactions were voided, TPR, Sagi, the Sagi Trust and the Trump Parties would all be unjustly enriched by the 2008 Stock Purchase Agreement and Side Letter.

137.    The Trump Parties also knew that if the 2004 TPR Transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust were voided, that these TRI shares recovered by TPR would be the subject of a constructive trust established for the benefit of Arie, the Orly Trust and the Sagi Trust.

138.    The Trump Parties, Sagi, and the Sagi Trust knew that Sagi, as an officer and director of TPR, owed a fiduciary duty to Arie, the Orly Trust, and the Sagi Trust, not to devalue or alienate Arie's and the Orly Trust's beneficial ownership of TPR insofar as TPR's ownership of the TRI shares was concerned, and not to strip Arie of his voting rights with respect to these TRI Shares.

139.    The Trump Parties, Sagi and the Sagi Trust knew at the time they executed the 2008 Stock Purchase Agreement that pursuant to the Court –Ordered Stipulation of Settlement, Arie had a contractual right to seek to reform the terms of the Stipulation of Settlement in order to give full effect to the intent of the parties with respect to his relinquishment of control in TPR in exchange for Arie's continuing control of 52.85% of TRI shares and outright ownership of 14% of TRI's stock, as a permitted transferee.

140.    The Trump Parties, Sagi, and the Sagi Trust knew at the time they executed the 2008 Stock Purchase Agreement and Side Letter that Arie was entitled to rescission for failure of consideration of that part of the Stipulation of Settlement that transferred his 51% of TPR to Dalia, in exchange for Dalia's agreement to have TPR concurrently transfer 14% of TRI's shares to Arie outright, and  that Arie would maintain voting control, or 52.85% of TRI for the duration of his life.

141.    In connection with the 2008 Stock Purchase Agreement and in furtherance of the plan and scheme to wrest control of TRI from Arie's control, the Trump Parties aided and abetted the preparation of a sworn affidavit swearing that the Sagi Trust shares had been lost, when the Trump Parties knew that was not a true statement.

**J.**    **The Trump Parties Declare Themselves The Majority Owners Of TRI, and Commence An Action In The Delaware Chancery Court To Determine The Composition of TRI's Board of Directors**

142.    On August 25, 2008, only three days after the 2008 Stock Purchase Agreement and 2008 Stock Purchase Side Letter Agreement were executed, the Trump Group asserted that it was in control of TRI through the acquisition of 1102.80 shares that were purportedly transferred to them by the Sagi Trust.

36

143.    On August 25, 2008, the Trump Parties commenced a Chancery Court in rem summary proceeding in the State of Delaware pursuant to 8 Del.C § 225(a) to determine the composition of the Board of Directors of TRI ("The Delaware Action") and to declare, inter alia that:

i.      the Trump Parties are the majority shareholders of TRI and have the right to vote all of its shares including the shares which were allegedly purchased pursuant to the Stock Purchase Agreement;

ii.     the 2004 transfers to Arie Genger, the Sagi Trust and the Orly Trust are void and continue to belong to TPR; and

iii.    that the Putative Irrevocable Proxies do not apply to the shares transferred pursuant to the Stock Purchase Agreement.

144.    Neither TPR, the Sagi Trust, nor the Orly Trust were a party to the Delaware Action, although TPR was given an opportunity to participate in that action, and refused to do so.

145.    The Trump Group as interested Directors in control of TRI had a fiduciary and legal duty to authorize the appointment of separate, independent counsel for TRI in connection with the Delaware proceeding and otherwise with respect to determining the beneficial and record ownership of the Arie, Orly Trust and Sagi Trust TRI shares.

**K.      The July 23, 2010 Opinion of the Delaware Chancery Court**

146.    On July 23, 2010 the Delaware Chancery Court issued a lengthy written decision which held that the transfers of TPR's TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the Stipulation of Settlement and 2004 Transaction Documents were void and ownership reverted to TPR and that TPR's sale of the Sagi Trust TRI Shares to the Trump Group pursuant to the 2008 Stockholders Agreement was valid.

147.    The Chancery Court also held that the Sagi Trust Irrevocable Proxy was not valid under New York or Delaware law.  The Chancery Court in this § 225 proceeding held that the Trump Group was entitled to elect a majority of TRI Board members.

148.    While voiding the 2004 Transfers, however, the Chancery Court in this July 23 decision also held that because Arie was a "permitted transferee" under the 2001 TRI Stockholders Agreement, the transfer of the TRI shares to him did not warrant a forfeiture of Arie's TRI Shares.

149.    Because Arie was a permitted transferee of the TRI shares owned by TPR (a Genger family holding company that Arie had created) the Trump Group would have no right to stop the transfer of these TPR TRI shares to Arie once it received contractual notice and Arie agreed to be personally bound by the TRI Stockholders Agreement.

150.    Under the Delaware Chancery Court's July 23 decision, Arie would retain his TRI shares once he gave formal notice of TPR's 2004 transfer and agreed to be bound by the 2001 TRI Stockholders Agreement, which Arie promptly agreed to do shortly thereafter.

151.    In its July 23, 2010 decision, the Court of Chancery also held that because neither Orly nor the Orly Trust were parties to the Delaware Chancery Court action, the Delaware Court declined to issue any ruling with respect to the Orly Trust TRI Shares.

**L.     The July 26, 2010 TRO in this New York Action**

152.    Based on the July 23, 2010 Chancery Court decision, Arie and Orly sought and obtained a temporary restraining order from this Court, restraining Sagi and TPR from selling or encumbering the Arie and Orly Trust TRI shares.  This temporary restraining order was granted on July 26, 2010 and extended by this Court on July 28, 2010.

**M.**    **The August Opinion of the Delaware Chancery Court**

153.    After being advised by the Trump Group of plaintiff being granted a TRO in this New York Action, the Delaware Chancery Court indicated that it would reexamine its rulings with regard to the Arie and Orly Trust TRI shares, and expressed concern about whether the New York TRO was designed to undermine its ruling in the Delaware Court, which it was not.

154.    On August 3, 2010, to allay the Court of Chancery's concerns, Arie's counsel in this case wrote to this Court advising that because defendants Sagi and TPR had agreed to abide by a *status quo order* entered by the Delaware Chancery Court, which provided that Arie would be given notice in the event TPR or Sagi intended to sell the Arie and Orly TRI Shares to the Trump Group, it was agreed among counsel for TPR, Sagi, Dalia and the plaintiffs, that the temporary restraining order would be vacated and plaintiffs in this action would accordingly withdraw their application for a preliminary injunction, without prejudice.

155.    On August 9, 2010, the Chancery Court made an abrupt "about face" regarding its determination earlier relating to the Arie and Orly Trust TRI Shares. In this second opinion, the Delaware Chancery reversed itself regarding the ownership of the Arie and Orly Trust Shares, and held that the Trump Group had the right to purchase the Arie and Orly Trust TRI shares from TPR under the 2008 Side Letter Agreement, even though the Court had held only two weeks earlier that Arie was a permitted transferee under the Stockholders Agreement and should be permitted to keep his shares, and that the Orly Trust was never a party to the § 225 proceeding. The Chancery Court also held that Arie and the Orly Trust had no beneficial interest in the Arie and Orly Trust TRI shares—even though TPR, Sagi, the Sagi Trust and the Orly Trust were never parties to the Delaware § 225 proceeding.

**N.**    **The Delaware Chancery Court's Final Judgment Order of August 18, 2010**

156.    On August 18, 2010, the Delaware Chancery Court entered a Final Judgment Order which found (i) that TPR's 2004 transfers of the Arie TRI Shares, and the Orly Trust TRI shares were void under the 2001 TRI Stockholders Agreement, (ii) that title to the Sagi Trust TRI Shares, the Orly Trust TRI Shares and the Arie TRI Shares, all reverted to TPR; (iii) that the Irrevocable Proxy for the Sagi Trust was not valid; (iv) that the sale of the Sagi Trust TRI shares by Sagi on behalf of TPR was valid; (v) that the Side Letter was a valid agreement; and (vi) that Arie and the Orly Trust had no beneficial or legal ownership interest in the Arie and Orly Trust TRI shares.

157.    There was no discussion or finding in the Chancery Court Decision as to whether Sagi was authorized to sell the Arie, Orly and Sagi Trust TRI Shares out of TPR.

158.    In addition to these holdings, the Chancery Court entered an anti-lawsuit injunction, which prohibited Arie from "commenc[ing] or prosecut[ing] any legal proceeding . . . in any [state] court [including the action in this Court which had already been commenced] constituting a collateral attack on, attempt to prevent implementation of, or relitigation of any of the [Chancery] Court's holdings set out in paragraphs 2 through 16 inclusive (summarized above), of this final judgment order" pending a determination of an appeal to the Delaware Supreme Court, with certain limited exceptions, but even the Chancery Court specifically recognized Arie's right to apply to this Court to seek to escrow the proceeds from TPR's impending sale of the Arie TRI Shares to the Trump Group, as follows:

> "Arie Genger shall have the right to seek an order from a court of competent jurisdiction requiring TPR Investment Associates, Inc. and its officers and directors to place in escrow the proceeds of sale of the shares of TRI referenced in paragraph 14 of this Order. [the "Arie TRI Shares"]."

**O.**     **Arie Appeals From the Chancery Court's Final Judgment Order**

159.    Arie timely appealed from the Chancery Court's rulings, arguing, inter alia, that
(i) the Trumps ratified the 2004 transfers, as a matter of law; (ii) the Irrevocable Proxy was valid
under New York law; and (iii) the Delaware Chancery Court had no jurisdiction to determine the
ownership of the Arie and Orly TRI shares or the validity of the Side Letter.

160.    Under threat of contempt, Arie agreed to stay this case pending a final
determination by the Delaware Supreme Court.

**P.**     **The Purported Sale by TPR of the Arie and Orly Trust TRI Shares**

161.    While Arie's appeal was pending, Arie was informed that TPR, without Arie's
consent or approval, intended to sell the Arie TRI shares to the Trump Group for $7,424,994.

162.    While the Trump Group and TPR agreed to hold $5,924,944 of these sale
proceeds in escrow pending a determination by the Delaware Supreme Court relative to the
ownership of the Arie and Orly Trust TRI shares, Sagi, as the CEO of TPR, insisted that TPR
was entitled to keep and spend the $1.5 million of the proceeds from the sale of the Arie TRI
shares, notwithstanding the pending appeal challenging the Chancery Court's rulings relating to
the ownership of the Arie and Orly Trust TRI Shares.

163.    While the appeal to the Delaware Supreme Court was pending, TPR, without the
consent or approval of Arie or Orly, also entered into an agreement to sell the Orly Trust TRI
Shares to the Trump Group for $10,314,005, with the proceed to be held in escrow by counsel
for Dalia as the nominal trustee of the Orly Trust.

164.    The Trump Group as interested Directors in control of TRI had a fiduciary and
legal duty to authorize the appointment of separate, independent counsel for TRI in connection
with the Delaware proceeding and otherwise with respect to determining the beneficial and

41

record ownership of the Arie, Orly Trust and Sagi Trust TRI shares prior to TRI recording the transfer of the Arie and Orly Trust Shares to the Trump Group in 2010.

165.    Neither Sagi nor TPR had any authority to sell the Arie or Orly Trust Shares to the Trump Group.

**Q.     This Court Enjoins TPR and Sagi From Taking or Using the $1.5 million Sale Proceeds From the Purported TPR Sale of the Arie Shares to the Trump Group**

166.    Arie moved by Order to Show Cause to restrain and enjoin Sagi and TPR from using or disposing of the $1.5 million sale proceeds that were about to be released to TPR, and requested that these specifically identified funds be placed in an acceptable escrow account or paid into Court. This Court by its February 17, 2011 Decision and Order decreed as follows:

> "ORDERED that the defendants Sagi Genger and TPR Investment Associates, Inc., and their agents, servants, employees and all other persons acting under the jurisdiction, supervision and/or direction of the defendants, are enjoined and restrained, during the pendency of this action, from doing or suffering to be done, directly or through any attorney, agent, servant, or employee or other person under the supervision or control of the defendants, from taking, using, or spending or converting to their own use otherwise, the $1.5 million proceeds from the sale of certain common stock in Trans-Resources, Inc. in which plaintiff claims an interest"

**R.     The Decision of the Delaware Supreme Court**

167.    On July 18, 2011, the Delaware Supreme Court reversed that part of the Delaware Chancery Court's Judgment that held that Arie and the Orly Trust were not the beneficial owners of the Arie and Orly Trust TRI Shares.

168.    On Arie's appeal the Delaware Supreme Court described the limited nature of the §225 proceeding as follows:

> A Section 225 proceeding is not an *in personam* action. Rather, it is "in the nature of an *in rem* proceeding," where the

"defendants" are before the court, not individually, but rather, as
respondents being invited to litigate their claims to the *res* (here,
the disputed corporate office) or forever barred from doing so.

\* \* \*

[For example] in a Section 225 proceeding the court "cannot go
further and actually rescind a transaction procured through such
unlawful behavior or award money damages to those harmed by
that behavior." That type of ultimate relief can only be obtained in
a plenary action in a court that has *in personam* jurisdiction over
any necessary or indispensable parties.

169.    Further explaining the limited holding of the Delaware Chancery Court, the

Delaware Supreme Court held:

Given the jurisdictional limitations that inhere in a Section 225
action, we affirm the judgment of the Court of Chancery insofar as
it determines the *record* [emphasis in original] ownership of the
disputed Trans-Resources shares in the Side Letter Opinion and the
Final Judgment Order.

\* \* \*

An adjudication of who has the right to vote disputed corporate
shares for Section 225 purposes cannot constitute a binding
adjudication of who beneficially owns those shares, because a
Section 225 action is by its nature an *in rem*, not a plenary,
proceeding. **Only in a plenary proceeding before a court that
has *in personam* jurisdiction over the litigants may the court
adjudicate the litigants' property interest in disputed
corporate shares.**

(Emphasis added)

170.    The Delaware Supreme Court also held that the issue of ultimate beneficial

ownership of the Arie TRI Shares and the Orly Trust TRI Shares was beyond the equity

jurisdiction of the Chancery Court in the summary § 225 *in rem* proceeding, and that the issue of

the beneficial ownership of those shares needed to be adjudicated in a plenary action in a

jurisdiction where the Court has *in personam* jurisdiction over all indispensible parties.  These

43

necessary parties -- Arie, TPR, Sagi, Orly, the Orly Trust and the Trump Group -- are all parties to this New York action , and have been served and have appeared in this case.

171.    The Delaware Chancery Court's holdings were limited to an in rem proceeding to determine who held the record ownership of the shares at a point in time in order to determine voting rights to elect members of the TRI Board based on the record owners of those shares at the time of the election.

172.    The Delaware Chancery Court was without jurisdiction to determine the ultimate ownership of the Arie and Orly Trust TRI shares or any of the tort claims asserted by Plaintiffs in this action. Nor did the Delaware Chancery Court have jurisdiction to determine Arie's claims for rescission, unjust enrichment, constructive trust or reformation arising from and in connection with the Court-ordered Stipulation of Settlement, the 2004 Transaction Documents, or the authority of Sagi to act on behalf of TPR.

173.    The Delaware Supreme Court affirmed that portion of the Chancery Court ruling that held that TPR's 2004 transfers of TRI shares pursuant to the Stipulation of Settlement in the Genger divorce and implementing 2004 TPR Transaction Documents violated the 2001 TRI Stockholders Agreement and were void ab initio, for the purpose of the Delaware § 225 proceeding to determine composition of the TRI Board.


## FIRST CAUSE OF ACTION ON BEHALF OF PLAINTIFF ARIE GENGER

**(For a Declaratory Judgment Under CPLR 3001 that the
Stipulation of Settlement Entitles Plaintiff Arie to a
Court-Ordered Reformation of the Terms of the Stipulation
of Settlement as Against All Defendants)**

174.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 173.

44

175.    Article XVI of the Stipulation of Settlement provides that the parties to the
Stipulation of Settlement have a right to seek court-ordered reformation in a New York court in
order to reflect the parties' original intent in the event a portion of the "So-Ordered" Stipulation
of Settlement is held to be invalid for any reason.

176.    The concurrent transfer of Arie's ownership of his 51% interest in TPR in
consideration of receiving a 14% interest in TRI and the right to control the voting rights of
52.85% of TRI Shares for the duration of Arie's life was an essential, fundamental condition of
the transfers of TPR and TRI shares set forth in the  Court-Ordered Stipulation of Settlement.

177.    The Delaware Chancery Court, as affirmed by the Delaware Supreme Court, held
that TPR's 2004 transfers of 52.85% of the shares of TRI Stock under the Stipulation of
Settlement and 2004 TPR Transfer Documents were invalid and void *ab initio*, and that the
Putative Irrevocable Proxies were invalid.

178.    The provisions of the Court-Ordered Stipulation of Settlement relating to the
transfer of ownership of TPR in consideration of the 2004 Transfers were based upon the mutual
mistake of Dalia and Arie that the 2004 Transfers and Irrevocable Proxies were valid.

179.    The Court-Ordered Stipulation of Settlement specifically provides that the parties
agree that if any of the terms of the Stipulation of Settlement is declared invalid by any court of
competent jurisdiction for any reason, Arie is entitled to seek an Order from this Court to reform
the Stipulation of Settlement, or obtain such other equitable or legal relief as is necessary to give
full meaning and expression to the original intent of the parties to the Court–Ordered Stipulation
of Settlement.

45

180.    Arie is entitled to an Order of the New York Supreme Court to reform the terms of the Court-Ordered Stipulation of Settlement to reflect the parties' original intent to the greatest extent possible.

181.    Accordingly, Arie seeks an Order and declaratory judgment to reform the Court-Ordered Stipulation of Settlement to provide as follows:

(i)      That the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii)     that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii)    that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie ("TPR2");

(iv)    that Arie be declared the 51% owner of TPR2, which in turn shall be declared, *ab initio* the record and beneficial owner of all of such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v)     that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

46

(vi)     that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would be otherwise permitted and would not violate the terms of the 2001 Stockholders Agreement including, but not limited to, Article 2 of such agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI Shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii)    All cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix)     Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x)     The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

182.    The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

183.    The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

184.    The purported sales by TPR of the Arie and Orly Trust TRI shares to The Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void, and the proceeds from these purported sales now held in escrow will be released to The Trump Group.

185.    TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

186.    TPR2 will consent to the terms of the 2001 Stockholders Agreement.

187.    Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court Ordered Stipulation of Settlement in light of the ruling of the Delaware court that the 2004 Transfers were invalid.

188.    There is a justiciable controversy.

189.    There is no adequate remedy at law.

### SECOND CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

**(For the Imposition of a Constructive Trust against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)**

190.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 189, and incorporate the allegations contained in paragraphs 209-219.

191.    Upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares.

48

192.    TPR is not entitled, in equity or good conscience, to retain any direct or indirect benefit resulting from the record ownership of the 3000 shares of TRI stock reverting to TPR as a result of the ruling of the Delaware courts .

193.    TPR would be unjustly enriched at the expense of Arie if it were permitted to retain any direct or indirect ownership or benefit from the sale of the 3000 shares of TRI stock because record ownership of such TRI shares reverted to TPR as a result of the Delaware court rulings.

194.    Upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares.

195.    Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death.

196.    Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death.

49

197.   Upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Trust Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie.

198.   Arie's beneficial ownership and voting rights with respect to the 3000 TRI shares, which were held by TPR in a constructive trust for his benefit, were protected from further transfer to The Trump Group from the moment record title reverted to TPR.

199.   TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares.

200.   TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie.

201.   The Trump Group are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

202.   The Trump Group was on notice of Arie's ownership and voting right claims with respect to the 3000 TRI shares that reverted to TPR, as record owners.

203.   The Trump Group knew and were on notice that TPR was not authorized to sell TPR's TRI shares without the prior consent of Arie.

204.   The Trump Group knew and was on notice that Arie objected to the sale to The Trump Group of any of the 3000 TRI shares that reverted to TPR, as record owner under the 2008 Stock Purchase Agreement, the Side Letter Agreement or the 2010 purported sale of the Arie and Orly Trust TRI shares.

205.   The Constructive Trust in favor of Arie imposed upon the Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to The Trump Group, who were not bona fide purchasers.

206.   The Trump Group, in addition to TPR, would be unjustly enriched if they were permitted to keep the benefit of the purported sale by TPR of the 3000 TRI shares to The Trump Group, which sale Sagi was not authorized to enter into on behalf of TPR without the prior consent of Arie because, inter alia,

(i) the Trump Group would become the owner of the Arie, Sagi Trust and Orly Trust Shares, over the objection of Arie and without Arie's required prior permission and consent;

(ii)   the Trump Group would obtain Arie's right to vote these shares for the duration of his lifetime, without Arie's required prior permission and consent; and

(iii)   these shares would be acquired substantially below their true value without Arie's required prior permission and consent;

(iv)   the purported transaction by TPR was in derogation of Arie's beneficial ownership and voting rights appurtenant to such shares; and

(v)   the Trump Group are not bona fide purchasers of such shares.

207.   Plaintiffs have no adequate remedy at law.

51

## THIRD CAUSE OF ACTION
## ON BEHALF OF ARIE AND ORLY

**(Claim for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty and Conspiracy to Breach Fiduciary Duty Against Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI)**

208.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 207.

209.    Sagi, individually and as an officer of TPR, owed a fiduciary duty of trust, confidence and loyalty to Arie and the Orly Trust because, among other things, (i) he was entrusted to manage TPR's ownership of the TRI shares for the benefit of Arie and the Orly Trust upon the Chancery Court voiding the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust, and the resulting ownership of such 52.85 % of TRI shares by TPR; (ii) he was entrusted to manage TPR's record ownership of the TRI shares for the benefit of Arie and the Orly Trust upon the Delaware Chancery Court voiding the 2004 TPR transfer of TRI shares to Arie, the Sagi Trust and the Orly Trust; (iii) pursuant to the 2004 TPR Transfer Agreement, Sagi was entrusted to take all actions necessary to ensure that Arie would maintain voting control of 52.85% of the stock of TRI in accordance with the express intent of all parties to the Stipulation of Settlement and 2004 TPR Transaction Documents; (iv) through Fang and the Sagi Trust, as his co-agents and alter egos, Sagi owed a duty of trust and confidence to Arie under the 2004 Voting Trust Agreement; and (v) as the successor to the rights and liabilities of Dalia under the Stipulation of Settlement and the manager of TPR, as a family holding company, Sagi owed a fiduciary duty to protect the assets of the Orly Trust for the benefit of his sister Orly and his father, Arie, in connection with the ownership of TPR, TPR's ownership of the TRI shares and D&K's minority ownership of TPR.

52

210.    As a fiduciary Sagi, individually, and as an officer of TPR, owed a duty of fidelity and undivided loyalty to Arie, Orly, and the Orly Trust regarding the TRI shares.

211.    Fang, individually and as the trustee of the Sagi Trust, owed a fiduciary duty to Arie under the 2004 Voting Trust Agreement and Side Letter.

212.    The Trump Group, on becoming the majority shareholder of record in TRI, owed a fiduciary duty of fidelity and loyalty to Arie as the known beneficial owner of record of the Arie TRI shares.

213.    Jules Trump and Mark Hirsch, each individually and on behalf of the Trump Group, and as Directors of TRI owed a fiduciary duty to TPR, and Arie as the beneficial owner of TRI shares to read TRI corporate documents presented to him in their entirety and have knowledge of the shareholders of record of TRI, a close corporation.

214.    Sagi, TPR, the Sagi Trust, Fang, the Trump Parties each breached their respective fiduciary duties as a result of the conduct set forth in the allegations of this complaint, including, but not limited to their respective conduct in connection with the negotiation, execution and implementation of the 2008 Stock Purchase Agreement and the Side Letters and the subsequent transfer of the Arie and Orly Trust TRI Shares.

215.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties also knowingly aided, abetted, induced, participated in, enabled and substantially assisted each other to breach each of the other's respective fiduciary duties to Arie, Orly and the Orly Trust by the conduct alleged herein, including but not limited to misrepresenting to the Delaware Chancery Court that the share certificates for the Sagi Trust TRI shares were lost despite having actual knowledge that

53

such share certificates were held by Arie, and had not been delivered to the Sagi Trust, Sagi or Fang.

216.    TRI also knowingly aided, abetted, induced, participated in, enabled and substantially assisted the respective breaches of fiduciary duties owed to Arie, Orly and the Orly Trust by Sagi, TPR, the Sagi Trust, Fang and the Trump Parties.

217.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties, each acting in conspiracy with, and as the co-agent of one another, entered into an illegal scheme, agreement, plan, and artifice to breach each other's respective fiduciary duties owed to Arie, Orly, and the Orly Trust by the conduct alleged herein in furtherance of this conspiracy.

218.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duties and conspiracies to breach fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, and each of them, Arie suffered compensatory damages in an amount to be determined.

219.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duty and conspiracies to breach  fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, and each of them, Orly, individually and as the beneficiary of the Orly Trust, suffered compensatory damages in an amount  to be determined.

## FOURTH CAUSE OF ACTION
## ON BEHALF OF ARIE AND ORLY

**(Claim for Unjust Enrichment and Rescission Against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)**

220.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 219.

221.    As a result of the Delaware Chancery Court holding, Dalia, TPR, Sagi, the Sagi Trust and the Trump Parties would each be unjustly enriched at the expense of Arie and the Orly

54

Trust if each or any of them were allowed to retain any direct or indirect benefit or consideration received by each of them from TPR's ownership of TRI Shares, which none of them are entitled, in equity or good conscience, to retain.

222.    Plaintiff Arie is entitled to rescind the transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents based on failure of consideration because, as a result of the holding by the Delaware Chancery Court, Arie did not receive any of the consideration that was due to him pursuant to such Agreements, including and not limited to (a) his 14% interest in the Arie TRI Shares, and his right to vote 52.85% of the TRI Shares that he controlled prior to the Delaware Court voiding the 2004 Transfers.

223.    Plaintiff the Orly Trust, is entitled to rescind the 2004 Transaction Documents based on failure of consideration because as a result of the holding by the Delaware Court the Orly Trust did not receive any of the consideration due to the Orly Trust pursuant to the 2004 Transfers.

224.    Arie and the Orly Trust are each also entitled to rescission because of failure of consideration based on mutual mistake as to the enforceability of the 2004 TPR Transfers of TRI stock to Arie, the Sagi Trust and the Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents.

225.    Arie and the Orly Trust are each entitled to an accounting.

226.    Arie and the Orly Trust have no adequate remedy at law.

### FIFTH CAUSE OF ACTION

**(Claim for Permanent Injunction Against Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties)**

227.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 226.

55

228.    Plaintiffs are entitled to the issuance of a permanent injunction enjoining and restraining Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties, and each of them, from directly or indirectly transferring,  selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI stock that reverted to TPR's control as a result of the Delaware Court rulings.

229.    The failure to grant such permanent injunction will result in irreparable injury to the Plaintiffs.

230.    There is no adequate remedy at law.

231.    The balance of equities favor the Plaintiffs.

### SIXTH CAUSE OF ACTION

**(Claim for Breach of Contract against TPR on Behalf of Arie and Orly)**

232.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 231.

233.    TPR entered into the 2004 TPR Transfer Agreement with Arie.

234.    TPR entered into the 2004 TPR Transfer Agreement with the Orly Trust.

235.    TPR breached its express and implied covenants and representations thereunder in connection with the transfer of TRI shares to Arie.

236.    TPR breached its express and implied covenants and representations thereunder by purporting to agree to transfer the Arie, Sagi Trust and Orly Trust TRI Shares to the Trump Parties.

237.    Arie and the Orly Trust performed their respective obligations under the 2004 TPR Transfer Agreement.

56

238.   As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

239.   TPR breached its express and implied covenants and representations under the 2004 Transaction Documents in connection with the transfer of TRI shares to the Orly Trust.

240.   The Orly Trust performed its obligations under the 2004 TPR Transfer Agreement.

241.   As a result of such breach of contract, the Orly Trust lost the benefit of its bargain and suffered damages in an amount yet to be determined, but believed to be in an amount to be determined.

## SEVENTH CAUSE OF ACTION
## ON BEHALF OF ARIE

### (Claim for Breach of Contract against the Sagi Trust)

242.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 241.

243.   The Sagi Trust entered into the 2004 Voting Trust Agreement with Arie.

244.   The Sagi Trust breached its express and implied covenants and representations thereunder in connection with Arie's voting rights and control of TRI shares.

245.   Arie performed his obligations under the 2004 Voting Trust Agreement.

246.   As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

## EIGHTH CAUSE OF ACTION
## ON BEHALF OF ARIE AND ORLY

### (Claim for Tortious Interference with Contract Against the Trump Parties)

247.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 246.

57

248.    The Trump Parties, and each of them, tortiously interfered with, among other things, (i) the Stipulation of Settlement between Arie and Dalia, (ii) the 2004 TPR Transfer Documents between Arie and the Orly Trust and TPR, (iii) the 2004 Voting Trust Agreement between Arie and the Sagi Trust, and (iv) the 2004 Voting Trust Agreement between Arie and the Orly Trust.

249.    The Trump Parties, and each of them, intentionally caused such breaches of contract  without justification, as a result of the conduct set forth herein.

250.    As a result of the Trump Parties' tortious interference with contract, Arie suffered damages in an amount yet to be determined.

251.    As a result of the Trump Parties' tortious interference with contract,  Orly and the Orly Trust suffered damages in an amount yet to be determined.

## NINTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

### (Claim for Aiding and Abetting Tortious Interference with Contract Against Sagi, Fang, and the Sagi Trust)

252.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 251.

253.    Sagi, Fang, and the Sagi Trust each had knowledge of the Trump Parties' tortious interference with the 2004 TPR Transaction Agreement and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the commission of the foregoing acts of tortious interference with 2004 TPR Transaction Agreement and the Stipulation of Settlement.

254.    Sagi, Fang, and  TPR each had knowledge of the Trump Parties' tortious interference with the 2004 Voting Trust Agreement, and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the

commission of the foregoing acts of tortious interference with the 2004 Voting Trust

Agreements.

255.   By reason of the foregoing, Arie has been damaged in an amount to be

determined.

256.   By reason of the foregoing, Orly, individually and as the beneficiary of the Orly

Trust has been damaged in an amount to be determined.

## TENTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

### (Claim for Preliminary Injunction Against the Trump Parties, Sagi Genger TPR and the Sagi Trust Under CPLR 7109)

257.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 256.

258.   The  Arie and Orly Trust TRI shares are unique chattel.

259.   By virtue of the facts set forth above, Arie is the beneficial owner of the Arie TRI

shares.

260.   Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,

dilute, or take any action on behalf of TPR relating to or concerning the 3000 TRI shares that

reverted to TPR, without the prior written consent of Arie and Sagi is not authorized to exercise

any and all rights, including TPR's voting rights with respect to such 3000 TRI shares, except as

so directed by Arie as the beneficial owner of such shares and the voting rights appurtenant

thereto.

261.   Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,

dilute, or take any action on behalf of TPR relating to or concerning the Orly Trust TRI shares.

262.   By virtue of the facts set forth above, the Orly Trust is entitled to the benefits

provided to it under the Stipulation of Settlement.

263.    The Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust shares are wrongfully being held by the Trump Parties.

264.    Plaintiffs are entitled to a preliminary injunction, under CPLR 7109, that the Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares shall be restrained and enjoined from transferring, selling, diluting, pledging, assigning or otherwise disposing of or removing such shares from the State until the further order of the Court.

**WHEREFORE**, Plaintiffs demand Judgment in favor of Plaintiffs against the Defendants as follows:

(a) on the **First Cause of Action against all Defendant**s: that this Court find and declare that Arie is entitled to an Order from this Court to reform the terms of the Court-Ordered Stipulation of Settlement to provide as follows:

(i)  that the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii)  that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii) that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie (hereinafter, "TPR2");

60

(iv) that Arie be declared the 51% owner of TPR2 which in turn shall be declared, ab initio, the record and beneficial owner of all such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v) that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

(vi) that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would otherwise be permitted and would not violate the terms of the 2001 Stockholders Agreement, including, but not limited to, Article 2 of such Agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii) all cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix) Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x) The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

(xi) The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

(xii) The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

(xiii) The purported sales by TPR of the Arie and Orly Trust TRI Shares to the Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void and the proceeds from these purported sales now held in escrow will be released to the Trump Group.

(xiv) TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

(xv)    TPR2 will consent to the terms of the 2001 Stockholders Agreement.

(xvi) Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court-Ordered Stipulation of Settlement in light of the rulings of the Delaware Court that the 2004 Transfers were invalid.

(xvii) Any other declaration as the Court may deem fair and reasonable to give effect to the Original Intent of the parties to the Stipulation of Settlement.

(b) on the **Second Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties**, that the Court find and declare that:

(i) upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares;

(ii) upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares;

(iii) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death;

(iv) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death;

(v) upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie;

(vi) TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares;

(vii) TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie;

(viii) The Constructive Trust in favor of Arie imposed upon Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to the Trump Group, who were not and are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

(c) on the **Third Cause of Action against Defendants Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, jointly and severally**, as follows:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly Genger individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(d) on the **Fourth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties**:

(i) rescinding Plaintiff Arie's transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents;

(ii) rescinding the 2004 Transaction Documents;

(iii) Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties must account to Arie and Orly, individually and as the beneficiary of the Orly Trust, for 3000 TRI Shares and/or their respective value that are now or ever have been in their respective possession, custody or control; and

(iv) such other equitable relief as the Court may deem fair and reasonable;

(e) on the **Fifth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties,** permanently enjoining and restraining these Defendants, and each of them, from directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI common stock that reverted to TPR as a result of the Delaware court rulings.

(f) on the **Sixth Cause of Action against Defendant TPR**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action; and

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action.

(g) on the **Seventh Cause of Action against Defendant Sagi Trust**, a money judgment awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plainitiff's attorneys' fees and costs incurred in connection with this action;

65

(h) on the **Eighth Cause of Action Against the Defendant Trump Parties, jointly and severally**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(i) on the **Ninth Cause of Action Against Sagi, Fang, and the Sagi Trust**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly, individually and as the beneficiary of the Orly Trust, in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(j) on the **Tenth Cause of Action for a Preliminary Injunction Against the Trump Parties, Sagi Genger, TPR and the Sagi Trust Under CPLR 7109**, and each of them for an injunction or temporary restraining order under CPLR 7109, restraining and enjoining each of them from transferring, selling, diluting, pledging, assigning or otherwise disposing of or

66

removing the Arie TRI Shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares from the State until the further Order of the Court.

(k) **On all causes of action set forth in this Complaint**, such other relief as this court may deem just, together with the costs and disbursements incurred by plaintiffs in this action, including the recovery of plaintiffs' reasonable attorneys' fees.

67

DATED: New York, New York          MITCHELL SILBERBERG & KNUPP LLP
        September 20, 2011

By: _____

Paul D. Montclare (PM 4454)
Lauren J. Wachtler (LW 4205)
12 E. 49th Street, 30th Floor
New York, New York 10017
(212) 509-3900

Attorneys for Plaintiff ARIE GENGER

ZEICHNER ELLMAN & KRAUSE LLP

By: Yoav Griver by Lauren Wachtler with permission
Yoav M. Griver
Bryan D. Leinbach
575 Lexington Avenue
New York, New York  10022
Telephone: (212) 223-0400
Facsimile: (212) 753-0396

Attorneys for Plaintiff ORLY GENGER, in
her individual capacity and on behalf of the
ORLY GENGER 1993 Trust